Howard P. SIEVERT, et al.,
Respondents,

v.

FIRST NATIONAL BANK IN
LAKEFIELD, Minnesota,
Appellant,

Muir, Lundblad, Meyer, Storey, Simons,
Costello & Jungas, and David D.
Meyer, individually, Respondents,

Harold G. Thornburg, et al.,
Defendants.

No. C5-83-1546.

Court of Appeals of Minnesota.

Nov. 13, 1984.

Review Denied Feb. 5, 1985.

**410**

James Malcolm Williams, Minneapolis, for respondent Howard P. Sievert.

Charles A. Cox, Cox & Goudy, Minneapolis, for appellant.

William S. Rosen, Rosen & Ballenthin, St. Paul, for respondent Muir et al.

Laurence R. Waldoch, Lindquist & Vennum, Minneapolis, for defendant Harold G. Thornburg.

Heard, considered and decided by FOLEY, P.J., and RANDALL, and CRIPPEN, JJ.

## OPINION

FOLEY, Judge.

Howard Sievert and his wife Daun sued the First National Bank in Lakefield, former bank president Harold Thornberg, and attorney David Meyer and his law firm in connection with financing transactions involving construction and operation of the North Ridge Golf Course. Sievert alleged fraud, undue influence, malicious interference with contract, conversion, and improper handling and sale of stock. He alleged that Meyer, while representing him, conspired with the bank to defraud him. Sievert sought rescission of all financing documents involving North Ridge and damages in excess of $15,000,000. The bank counterclaimed to foreclose on collateral.

The trial court granted summary judgment with respect to claims against Thornberg. It dismissed punitive damage claims against the other parties. It reserved to itself the bank's counterclaims. The court submitted a special verdict including 25 questions to the jury.

The jury found no malpractice by Meyer or his firm. It found that the bank gave Sievert adequate notice of the sale of the golf course and obtained a reasonable price for the property. However, the jury found that the bank misrepresented to Sievert the status of his Small Business Administration (SBA) loan. It also found the bank was commercially unreasonable (a) in presenting 17 documents to Sievert to sign on March 1, 1979, (b) in presenting documents to Sievert to transfer ownership of the golf course real estate from his individual name to North Ridge Development Corp., and (c) in failing to develop "whatever potential" there might have been to sell the golf course to Duane Sather.

The jury found no damages in connection with the misrepresentation about the loan or the presentment of the 17 documents, which included those transferring the golf course real estate to the corporation. It found $175,000 in damages in connection with the transfer of real estate to the corporation, and $50,000 in connection with the bank's failure to sell the property to Sather.

The trial court denied rescission and ruled that the bank was entitled to set off against the verdict $149,010.73, the balance of Sievert's debt to the bank. The trial court denied the bank's motion for new trial. The bank appeals and Sievert cross appeals. We reverse and remand.

## FACTS

Howard Sievert is a Lakefield farmer and contractor. He and Ronald Bloom, a golf course architect, formed a partnership to develop a golf course in Lakefield. They bought 79 acres for the project. Meyer, a local attorney, did the legal work involved in buying the land and incorporating North Ridge Development Corporation. Construction started in the spring of 1976, financed by bank loans from the First National Bank in Lakefield and sales of club memberships to the public. Before the project was completed Bloom sold his half interest to Torval Barkheim, a local farmer. Barkheim invested in the project upon the advice of bank president Harold Thornberg.

The club house opened in the spring of 1977 and the golf course opened later that summer. Almost immediately the partners began looking for a buyer. At their request, Thornberg placed ads in the Wall Street Journal. No offers resulted.

In August 1978 Thornberg sold his interest in the bank to Doug Kratz. When Kratz took over as president of the bank, Sievert owed the bank approximately $312,000, a $212,870.88 note due December 31, 1978, and a $100,000 mortgage on the golf course with no specified due date. The $100,000 note called for payments according to an amortized schedule, but no schedule was ever established.

The bank held as security a $100,000 mortgage on 68 acres of the golf course, two unrelated contracts for deed, and a $65,000 mortgage on Sievert's home. Sievert had requested and been denied additional credit because he refused to give additional collateral.

Sievert failed to repay any of the principal on the loans by December 31, 1978. Payments from the contracts for deed assigned to the bank paid some of the accrued interest.

In January 1979 Sievert began negotiating to buy Barkeim's interest in the business. Kratz suggested applying for a SBA loan to finance the transaction. The partners settled on a purchase price of $310,000. The money was to be paid in cash if the SBA loan was approved. If the loan was not approved Sievert was to pay $75,000 down and the rest in quarterly installments of approximately $6,000. Barkheim required Sievert to pledge a $100,000 certificate of deposit as security for the deal.

Sievert testified that he understood that if the SBA loan fell through the bank would lend him an additional $175,000 to complete the deal. He also understood that if the loan was not approved and the bank did not loan him the extra money there would be no sale. Kratz testified that he understood that Sievert wanted to buy Barkheim's interest regardless of the outcome of the SBA loan application. He said Sievert told him he planned to borrow the downpayment from another bank. Kratz said he did not commit his bank to any additional loans.

In January 1979 Kratz prepared a SBA loan application for Sievert and the corporation. Kratz told Sievert and Barkheim that to obtain a SBA loan the golf course property would have to be put in the name of the corporation. Sievert said both Kratz and Meyer informed him that if the loan fell through the property would be returned to individual ownership. Kratz also informed Sievert that a turn around in management was essential to getting a SBA loan. In late January 1979 Sievert hired Tom Priebles to manage the business.

The SBA rejected Sievert's loan application by a letter dated February 21, 1979. Kratz said that upon receipt of the rejection he contacted the SBA and was told that if the operation could be turned around SBA would reconsider the application. Kratz said he advised Sievert and

Barkheim of the rejection and met with them the last week of February 1979 to plan how to proceed.

On March 1, 1979, the bank presented to Sievert and Barkheim a total of 17 documents concerning the buy out agreement and refinancing the debt on the golf course. The bank loaned the corporation $142,000 to be repaid August 31, 1979. The money was used to retire the $100,000 mortgage and pay legal fees, taxes and operating expenses.

In exchange for the loan, Sievert and Barkheim transferred the golf course real estate and improvements to the corporation, which then gave the bank a $142,000 mortgage on the property and a security interest in the fixtures. In addition, Sievert and Barkheim pledged their corporate stock to secure the loan. Barkheim, Sievert and his wife personally guaranteed the loan.

Sievert and Barkheim also signed documents terminating their partnership and transferring Barkheim's interest in the business to Sievert. The buy out agreement obligated Sievert to buy the property without regard to the availability of SBA or other financing.

Both Sievert and Barkheim testified that they were not informed of the rejection of the SBA loan application before they signed the buy out agreement and the documents to transfer the golf course to the corporation. Sievert testified that Meyer represented him at the March 1, 1979 meeting and that he signed the documents because Meyer told him to sign. Meyer and Kratz testified that Meyer represented the bank and drafted the documents as per Kratz' instructions. Barkheim verified that he knew Meyer was the bank's lawyer.

On March 16, 1979 Sievert's $216,000 note was extended to August 31, 1979, with accrued interest being added to the principal. The same day Sievert signed a new security agreement. The new agreement gave the bank a security interest in Sievert's inventory, equipment, farm products and consumer goods, and accounts receiva-

ble, in addition to the other items already pledged.

Sievert left for Duluth in March 1979 to begin a new construction project. He returned home on weekends, but management of the golf course fell primarily to Prieble. By June 1979, Prieble concluded that the project could not succeed and left. Sievert's wife and the bookkeeper took over management of the golf course. According to financial statements provided by the bookkeeper to the bank, the operation barely broke even, not taking into account the money owed the bank.

In late July and early August 1979 the bank courted prospective purchasers Byron Christopher and Duane Sather concurrently. Christopher was interested in purchasing the golf course, but not the club house. Sather was interested in putting together a group of investors to buy the entire business.

On the same day that Christopher was scheduled to formally present his offer, Kratz and bank vice president Ken Haddock met with Duane Sather. All three testified that Sather gave Haddock a $50,000 check to show that he was seriously interested in the deal. However, he instructed Haddock and Kratz not to cash it because there were insufficient funds in his account to cover the check.

Kratz and Haddock returned to the bank and met with Meyer, Sievert and his wife, and Barkheim and his wife. Kratz, Haddock and Meyer testified that Kratz and/or Haddock told the group that Sather was interested in buying the business; that Sather mentioned a purchase price of $550,000; and that Sather had given them a check for $50,000 to show his interest, but there were insufficient funds in the account to cover the check. Sievert and Barkheim testified that Kratz told them that he had sold the business for $550,000 and that he had a down payment check for $50,000.

The entire group met with Christopher and his attorney. According to Christopher, he offered $225,000 for the property. According to Christopher's attorney, the initial offer was reduced to $175,000 because of the memberships already sold. Sievert refused the offer.

Sather never bought the golf course. He declined to sign a sales contract presented to him by Haddock. Christopher testified that Sather told him that he had backed out of the deal because of pressure placed on him by the bank. Sather said nothing any bank representative did influenced his decision not to buy North Ridge. He found inadequate public interest to proceed.

In August 1979, after the Sather deal fell through, Haddock sought Sievert's consent to a public auction. After consulting attorney James Malcolm Williams, he gave written consent to the auction so long as he had the power to reject any bid. The day after the pre-auction meeting Sievert closed North Ridge. He did not make any payment on the obligations due August 31, 1979. An auction was held September 25, 1979. The bank rejected the high bid of $365,000.

The property was finally sold in April 1980, after the bank gave Sievert 30 days notice of foreclosure of the corporate stock. It brought $430,000. After legal fees, taxes, and other debts were paid, the net proceeds were split equally between Sievert and Barkheim. In 1982 the golf course was resold for $339,000.

## ISSUES

1. Did the trial court err in instructing the jury to apply a commercial reasonableness standard to the refinancing of a loan and to a lender's attempt to help a borrower sell real estate?

2. Are the jury's special verdict answers irreconcilable with respect to damages arising from documents signed by the borrower on March 1, 1979?

3. Did the trial court err in awarding speculative damages?

4. Did the misconduct of the borrower's attorney prejudice the trial?

## ANALYSIS

The record reveals several flaws in the trial proceeding. We could remand for trial on several grounds. First, the trial court erroneously instructed the jury to apply a commercial reasonableness standard to all of the bank's conduct. Second, the jury's special verdict answers dealing with damages arising from the March 1, 1979 documents are irreconcilable. Third, incessant misconduct by Sievert's attorney prejudiced the trial. However, we are compelled to reverse the jury's damage award because, in addition, we find that the award is speculative.

■ 1. The concept of commercially reasonable conduct has no application under the Uniform Commercial Code (UCC) to negotiating loan refinancing or to attempts by a lender to help a borrower sell real estate.

Sievert urges us to equate commercial reasonableness with good faith. The UCC imposes a duty of good faith performance of every contract or duty it covers. Minn. Stat. § 336.1–201 (1982). An early draft of the Code defined good faith to include not only "honesty in fact," but as "observance by a person of the reasonable commercial standards of any business or trade in which he is engaged." UCC § 1–201(18) (1950). The American Bar Association objected that the language was ambiguous and might be read to freeze commercial practices. 1951 ABA Section Report 126–28, 181. Consequently, the general definition of "good faith" was limited to "honesty in fact in the conduct or transaction concerned." Minn.Stat. § 336.1–201(19) (1982).

■ Only merchants involved in sales of goods are held to the higher standard of "honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." Minn.Stat. 336.2–103(1)(b) (1982). The bank does not qualify as a merchant involved in the sale of goods with respect to either the loan refinancing or the effort to sell the golf course to Sather. Therefore, under the UCC, its conduct should have been measured against the standard of "honesty in fact" rather than that of "commercial reasonableness."

■ 2. However, even if the court had applied the correct standard, we could not allow the jury's damage award to stand. The jury's special verdict answers concerning damages arising from the documents signed March 1, 1979 are irreconcilable. The jury found that the bank was commercially unreasonable in presenting 17 documents to Sievert, including two quitclaim deeds transferring the golf course from individual to corporate ownership. The jury found that presentation of all the documents caused no damage, but that the presentation of those documents transferring the real estate to the corporation caused $175,000 damages. Logically, if all of the documents caused no damage, no damage could have resulted from a few of them. When a jury's special verdict answers cannot be reconciled a new trial must be granted. *Page v. Blake*, 309 N.W.2d 802· (Minn.1981).

■ 3. In any event, the jury's award of $175,000 for transfer of the real estate to the corporation and $50,000 for failure of the Sather sale was speculative. Attorney Williams argued to the jury six overlapping elements of damage, including:

| | |
|---|---|
| $ 216,710 | interest |
| $ 142,000 | personal services in constructing and operating the golf course |
| $ 150,000 | loss of partnership capital |
| $ 25,000 | attorneys' fees to defend against suit by Barkheim for breach of sales agreement |
| $1,200,000 | loss of net worth |
| $ 240,000 | loss of redemption rights (loss of profit 8/78–8/80) |
| $ 240,000 | loss of profit 8/80–8/82 |
| $2,213,000 | Total |

■ Sievert's interest claim was not properly before the jury. The claim included increases in interest which the bank required to renew or extend loans, and interest on crops sequestered in connection with other foreclosure actions brought against Sievert by the bank. The trial court reserved the issues of interest and the validity of the other actions to itself.

So any jury award based on lost interest would be improper.

■ The next three items claimed were not proximately caused by the transfer of the real estate to the corporation or by the failure of the Sather sale. The claims for personal services and loss of partnership capital stem from Meyer's alleged negligence in not drafting the Sievert/Barkheim partnership agreement to provide for monetary recognition of Sievert's greater contributions to the business. The jury found that Meyer was not negligent in drafting the agreement.

■ Likewise, the claim for attorneys' fees arose from alleged misconduct other than that for which the jury awarded damages. The figure was suggested by Sievert's expert witness as the amount Sievert might incur in defending an action against him by Barkheim for breach of the buy out agreement. That suit allegedly resulted from the omission of a provision in the buy out agreement excusing performance should all financing fall through.

■ The final three items are too uncertain to justify the jury's award of damages. Damages which are speculative, remote or conjectural are not recoverable. *Leoni v. Bemis Co.*, 255 N.W.2d 824 (Minn. 1977). The law recognizes that proof of future loss ordinarily cannot be made to an absolute certainty. However, the existence and amount of such damages must be proved to a reasonable certainty as established by a preponderance of evidence. *Duchene v. Wolstan*, 258 N.W.2d 601, 605–606 (Minn.1977).

Sievert based his $1,200,000 loss of net worth claim upon his January 1979 financial statement showing a net worth of $848,000, and his unsubstantiated testimony that had he been left alone to run his business he would have been worth at least $2,000,000 by July 1982. Without more, the claim is sheer speculation. Furthermore, it duplicates other claims.

Sievert's claims for anticipated profits during and after the redemption period are similarly speculative. Attorney Williams urged the jury to award Sievert a total of $480,000 in lost profits for the period from August 1978 through August 1982. That figure presumes that (a) if Sievert had retained his redemption rights he could have prevented foreclosure, and (b) but for the actions of the bank, the golf course would have netted $10,000 per month profit during that four year period.

The record suggests that if Sievert could liquidate most of his assets other than the golf course he could have redeemed the property. However, the only evidence that the golf course would have been profitable was Sievert's unsubstantiated, self-serving prediction that he could have "worked that business to $30,000 [gross] a month" and that "30 percent of the gross profit would be for expenses and material."

The golf course has never generated such profits. In March 1979 Sievert was forced to obtain a loan to pay operating expenses. From then until Sievert abandoned the business in August 1979, it barely broke even, not counting debt reduction. Subsequent owners could not make a go of the golf course and sold it in May 1982, taking a $99,000 loss. In such circumstances, one could not find with reasonable certainty that the golf course would have generated $175,000 profits during the period from August 1979 through August 1982. The award must be attributed to passion and prejudice.

The jury's award of $50,000 for the bank's failure to develop the potential of a sale to Sather was likewise tainted by speculation encouraged by Williams. Williams urged the jury to assume that the check established a contract and that the $50,000 was earnest money to be forfeited if Sather did not complete the deal. He suggested to the jury:

It is obvious if Duane Sather had given $50,000 they could have signed an agreement, and Ladies and Gentlemen, I believe it is reasonable to conclude that the reason we never saw that check was because the check said this is an offer to buy North Ridge for $550,000, and this is a down payment. There is no other rea-

son for the check to disappear because that is what smart businessmen do when they take a check for $50,000. The terms are put there.

William's analysis of the missing check is contradicted by all of the evidence in the record. Sather, Kratz and Haddock, the parties to the discussion, all testified that no deal was consummated. There was no testimony that anyone saw terms written on the check. The trial court ruled, as a matter of law, that there was insufficient evidence to establish a contract binding upon Sather. Therefore, it was improper for the jury to treat the $50,000 check as earnest money which Sather forfeited by abandoning the deal.

4. Notwithstanding that we reverse on other grounds, we are compelled to condemn the incessant misconduct by attorney Williams. Throughout the six-week trial he was consistently rude, argumentative and abusive to witnesses and the court. He urged the jury to speculate on matters not before it and made repeated appeals to passion and prejudice. William's persistent misconduct made it impossible for the jury to arrive at an impartial verdict. A pattern of repeated attorney misconduct may necessitate a new trial, even where no one incident would be sufficiently prejudicial to require a new trial. *Nadeau v. County of Ramsey*, 277 N.W.2d 520, 524 (Minn.1979); *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775 (1975).

William's cross-examination of former Chief Justice Sheran, who testified as an expert witness for Meyers, was unwarranted and totally unprofessional. It exceeded all legitimate boundaries of vigorous cross examination. The following excerpt is illustrative of Williams' cross-examination of former Chief Justice Sheran:

> WILLIAMS: Well, Mr. Sheran, you regularly appeared before the juries as a defense lawyer and told the juries that you were representing an individual when in truth and fact you were representing an insurance company, isn't that true?
> OPPOSING COUNSEL: Argumentative, your honor.

> COURT: Objection sustained.
> SHERAN: It is an untrue statement in addition.
> WILLIAMS: Well, don't you think that a juror would want to know whether or not you were representing an insurance company as well as a client who you were professing to represent?
> OPPOSING COUNSEL: Same objection, your honor.
> COURT: Objection sustained.
> WILLIAMS: And yet you went through case after case for a number of years as a former FBI agent, knowingly misrepresenting to the juries time and time again that you were representing an individual when in truth in fact you were representing insurance companies in those cases?
> SHERAN: That statement is false and scandalous. * * *
> WILLIAMS: Didn't you, on several occasions, while you were on the court rule that if in fact a jury was told that there was an insurance company involved behind the defense lawyer, that you would take that jury verdict away from the plaintiff and send it back for a new trial because you felt that the jury is not entitled to know the truth about who in fact was being represented in the lawsuit?
> OPPOSING COUNSEL: I object, your honor, but I would ask the witness to be permitted to answer. * * *
> SHERAN: The statement is inaccurate and it is scandalous.

It is a hallmark of the law that advocates have the right to cross examine witnesses to test knowledge, credibility and bias. But it is not in keeping with the role of the advocate to try to humiliate a witness for self-gratification.

5. Sievert raises a number of claims upon cross appeal. After careful examination of the record, we find no merit to any of them.

## DECISION

We commend the trial court for its valiant perserverance under very provoking

circumstances during a long and difficult trial. But under the law and the facts, the verdict in favor of Sievert may not stand. Sievert failed in six weeks of trial to prove damages under any theory of liability. We hereby reverse the judgment for Sievert. We remand to the trial court with instructions to enter judgment for the First National Bank in Lakefield in the amount of $149,010.73, and to reinstate the bank's security interest in property listed in the trial court's April 21, 1983 conclusion of law No. 4.