**Gregory J. DUCHENE, et al., Respondents,**

v.

**Barry J. WOLSTAN, M. D., Appellant.**

**No. 47101.**

Supreme Court of Minnesota.

Sept. 16, 1977.

---

Peterson, Holtze & Treat, Theodore N. Treat, Jr., and Todd Maxwell Henshaw, Minneapolis, for appellant.

Green & Merrigan, Kenneth W. Green, and L. T. Merrigan, Minneapolis, for respondents.

Heard before ROGOSHESKE, Mac-LAUGHLIN, and PLUNKETT, JJ., and considered and decided by the court en banc.

MacLAUGHLIN, Justice.

This is an action to recover damages for personal injuries suffered by plaintiff Gregory J. Duchene, hereinafter plaintiff, when, as a pedestrian, he was struck by a motor vehicle operated by defendant, Barry Wolstan. The case was tried before a jury which found both parties causally negligent and apportioned 5 percent of the causation to plaintiff and 95 percent to defendant. Damages for plaintiff were assessed in the amount of $94,000. His wife was awarded $6,000 for her derivative claim. Judgment was entered accordingly, and defendant appealed from the denial of his post-trial motions for judgment notwithstanding the verdict or a new trial. We affirm.

Plaintiff is a dairy farmer from Sauk Centre, Minnesota, where he has owned and operated a 160-acre farm since 1967. In addition, he has operated his mother's 240-acre dairy farm, receiving in return, benefit of the use of her farm machinery for his farm, plus $250 per month as wages.

Among plaintiff's avocational interests is snowmobile racing. He participated in the 1972 St. Paul Winter Carnival snowmobile race between St. Paul and Winnipeg and to that end borrowed a pickup truck camper in which he lived during that race, which took place some 2 weeks before the accident in question. He again used the camper during snowmobile races in Forest Lake on Saturday, February 5, 1972. On that same date, he drove the camper to St. Paul to return it to the owner, Dan Rowe, who resided at 2156 Roblyn, 3 blocks north and east of the intersection of Marshall and Cretin Avenues. Plaintiff arrived at Rowe's home with the camper at approximately 6 p. m., snowmobiles in tow, and pulled into the alley behind the Rowe residence. His automobile, which he had left with Rowe, was parked on Roblyn. Plaintiff went to his car to drive it to the rear of the Rowe house where the snowmobile trailer was to be transferred to his car. He proceeded west on Roblyn one-half block to its intersection with Cretin Avenue. He then turned left on Cretin, a four-lane street, and went south another one-half block to the entrance of the alley. He stopped before turning into the alley to allow oncoming northbound traffic to clear. It was dusk, and although plaintiff could not recall whether or not he had his headlights on, he did remember having his turn signal on. While he was waiting, his car was struck from behind by a southbound vehicle driven by Sherrie Blahoski. Blahoski's car veered to the west and stopped partially off the road in a snowbank; plaintiff's car was spun around 180 degrees by the force of the impact and ended up facing north on Cretin. Plaintiff drove his car to the east curb just beyond the alley and parked it. Another driver, Neil Scott, had been following Blahoski and observed the accident. Scott stopped behind the Blahoski car and put on his emergency flashers, leaving his headlights on. No one was injured as a result of this first accident.

Plaintiff, after talking with Blahoski, started to walk up the alley toward Rowe's house to call the police. Another friend of plaintiff's, Gene Fiedler, was in the alley waiting to help him transfer the snowmobiles. Fiedler was looking down the alley as plaintiff approached and saw a police car pull up at the scene of the accident. He pointed out the arrival of the squad car to plaintiff, who turned around and headed back toward the street. Plaintiff was followed by Rowe and Fiedler.

The squad car contained three off-duty St. Paul police officers. They were riding in a "take-home" squad car and happened upon the scene of the accident. They stopped, pulling their squad car in front of the Blahoski car at a slight angle blocking part of the inner southbound lane of Cretin Avenue. The revolving light on top of the squad car was activated, and one of the officers walked up Cretin to the north of

the accident scene and began to direct the southbound traffic on Cretin. Another officer interviewed Blahoski and the third apparently called for an on-duty squad to handle the accident. No one sought to direct the northbound traffic.

To summarize, the following conditions existed just prior to defendant's car striking plaintiff: Plaintiff's disabled car occupied the easternmost lane of traffic of Cretin, just north of the alley; the westernmost lane of Cretin was blocked by the Blahoski car and the squad car; and the squad car also blocked a portion of the inner southbound lane of Cretin. The squad car had its revolving dome lights on, and the Scott car had its emergency flashers on. A police officer was directing the southbound traffic on Cretin. Plaintiff was walking down the alley toward Cretin, returning to the scene of the first accident. This was the setting encountered by defendant as he drove his car north on Cretin Avenue.

Defendant, accompanied by his wife, was proceeding from his residence at 1848 Ashland Avenue en route to a social engagement in Robbinsdale, Minnesota. He had driven west down Marshall to its intersection with Cretin Avenue, where he had turned right. It was his intention to travel north on Cretin to its intersection with Interstate Highway No. 94. As he proceeded on Cretin, he saw the police car's red lights at the accident scene. He continued to proceed north and ultimately struck plaintiff, who had emerged from the alley and was crossing the street to get to the squad car. Plaintiff suffered a broken femur as the result of the impact.

The following issues are raised on this appeal:

(1) Whether the evidence supports the jury's apportionment of causal negligence;

(2) Whether there is sufficient credible evidence to sustain the jury's award of damages; and

(3) Whether an instruction given by the trial court was erroneous.

1. Conceding that the apportionment of negligence is largely a question of fact, defendant argues that based upon the record, plaintiff's negligence equaled or exceeded that of defendant as a matter of law.

At the time of the accident, plaintiff was wearing a black snowmobile suit devoid of any decals or reflective markings. He testified that as he approached the end of the alley he stopped to let some cars go by. He looked to the south and saw a car approaching, which he estimated to be between 150 to 200 feet away. He began to cross the street, walking somewhat faster than normal, and had almost gotten to the centerline when he was struck by the left front fender of defendant's car. He was carried a short distance and then fell off the car onto the street.

Fiedler, Rowe, and Scott also observed the second accident. Fiedler and Rowe were both following plaintiff down the alley and were between 10 to 30 feet behind him. They were running to catch up to him, and they arrived at the curb just after plaintiff began to cross the street. They were both able to observe defendant's car as it approached. Fiedler estimated its speed at 40 miles per hour while Rowe felt that it was going "at least" 35 miles per hour, the speed limit at that location. Both men testified that defendant's car never braked or reduced its speed prior to the time it struck plaintiff. Rowe yelled a warning an instant before the impact when he saw that defendant's car was going to strike plaintiff.

Scott testified that he was standing near the Blahoski car waiting to give the police his name when the second accident occurred. He stated he was concerned about the blocked lanes and traffic and was observing approaching vehicles. He watched defendant's car for approximately 2 blocks as it approached and estimated its speed at 30 miles per hour. He also testified that at no time did defendant's car appear to slow down but rather maintained a steady speed until impact.

Defendant's version of the accident differs little from that recited by the other

witnesses. Defendant testified that as he saw the flashing lights, he commented to his wife, "You know, there might be an accident here, I think we better slow down." Defendant admitted that he was aware that there might be people milling around the accident scene. As a result, he claimed he either eased up on the accelerator or removed his foot from it but did not brake. Defendant estimated that he had slowed from 25 to 30 miles per hour to 20 miles per hour 1½ to 2 blocks from the accident scene, but he stated that he had maintained a steady speed for the last block or so before he struck plaintiff. He claimed never to have seen plaintiff before the impact and testified that he was surprised when the impact occurred.

 In reviewing a jury's apportionment of negligence, we are governed by the same standards as are applied in reviewing other jury findings, that is, we will not substitute our judgment for that of the jury unless there is no evidence reasonably tending to sustain the apportionment, or the apportionment is manifestly and palpably against the weight of the evidence. *Martin v. Bussert,* 292 Minn. 29, 37, 193 N.W.2d 134, 139 (1971). The apportionment should be left to the jury, except where there is no dispute in the evidence and the factfinder could come to only one conclusion. *Riley v. Lake,* 295 Minn. 43, 203 N.W.2d 331 (1972). The testimony was undisputed that defendant knowingly proceeded through an accident scene at a constant rate of speed, never braking. The jury could have believed the testimony which placed his speed as high as 35 to 40 miles per hour. Viewing the evidence in a light most favorable to the verdict, we hold that there is sufficient evidence to support the jury's apportionment of negligence.

2. Plaintiff suffered a comminuted fracture of the left femur. He was immediately placed in traction with a metal pin being surgically inserted through the portion of the leg just below the knee to which the traction ropes were attached. He remained in traction for approximately 30 days. His injury was extremely painful because every time he moved the broken ends of the bone would grate together. In March, the pin was removed from his lower leg, and he was placed in a cast enclosing his left leg and entire chest up to the armpits. Plaintiff testified that the cast was very uncomfortable, and that he found it very difficult to get around. Although the cast was removed in June 1972, he was unable to bear weight on the leg until August 1972, and he experienced a good deal of pain whenever he attempted to flex the knee joint. In November 1972, plaintiff's doctor advised him to begin exercising his leg, and plaintiff did so quite diligently. In the doctor's opinion, plaintiff made a good recovery but still suffered a 15-percent permanent partial disability of the leg.

In addition to claiming damages for his personal injuries, plaintiff sought to recover the losses he claimed to have suffered in his dairy business as a result of his injury. Defendant asserts that this claim is not based upon competent evidence but rather upon speculation. However, in addition to plaintiff's testimony concerning his business loss, the jury had the benefit of the testimony of Layton Hoysler, an eminently qualified expert in farm management.

Without reciting the details of the testimony, the record shows that Hoysler projected plaintiff's business losses from the time of the accident through 1978 as totaling $21,694. Hoysler testified that the consequences of the accident would extend beyond 1978, but felt that 1978 was the farthest point in time to which he could make his projections with reasonable certainty. Defendant offered no testimony in rebuttal regarding the claimed business losses, but did subject Hoysler to extensive cross-examination.

The thrust of defendant's argument, both to the jury and now to this court, is that the damages claimed were not certain, and, because they were dependent upon future events, lost profits could not be reasonably predicted.

 Proof of future loss ordinarily cannot be made to an absolute certainty and need only be made to a reasonable

certainty as established by a preponderance of evidence. Damages, to be recoverable, must not be speculative, remote, or conjectural. *Hornblower & Weeks-Hemphill Noyes v. Lazere,* 301 Minn. 462, 222 N.W.2d 799 (1974). The law does not require mathematical precision in proof of loss but only proof to a "reasonable, although not necessarily absolute, certainty." *Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.,* 297 Minn. 118, 125, 211 N.W.2d 159, 166 (1973). See, also, *Carpenter v. Nelson,* 257 Minn. 424, 101 N.W.2d 918 (1960).

The proof regarding lost profits in this case meets these criteria. Plaintiff established his damages through 1978 to a reasonable certainty by a preponderance of the evidence. The fact that the projected profits are not certain does not preclude recovery as long as there is a reasonable certainty that they would have been enjoyed. Viewing the evidence in a light most favorable to the jury's determination, it cannot be said that the lost profits, combined with the severe personal injury suffered by plaintiff, did not justify the jury's award of $94,000.

3. We decline to consider the questions raised by defendant regarding the propriety of one of the trial court's instructions to the jury. Not only did defendant fail to object to the specific instruction at trial, but he also failed to raise the issue in his motion for a new trial. It is an established principle that where no exceptions are taken to instructions to the jury, and the claimed error in such instructions is not assigned as grounds for a new trial, the instructions become the law of the case and may not be challenged for the first time on appeal. *Erickson v. Sorenson,* 297 Minn. 452, 211 N.W.2d 883 (1973); *Jacoboski v. Prax,* 290 Minn. 218, 187 N.W.2d 125 (1971); *Holkestad v. Coca-Cola Bottling Co.,* 288 Minn. 249, 180 N.W.2d 860 (1970); *Schunk v. Wieland,* 286 Minn. 368, 176 N.W.2d 119 (1970). On these grounds any objection defendant might have made must be deemed waived, and the instructions given by the trial judge must be considered the law of the case.

Affirmed.

SCOTT, J., took no part in the consideration or decision of this case.