**HYDRA–MAC, INC., Plaintiff,**

**International Harvester Company, Respondent,**

v.

**ONAN CORPORATION, petitioner, Appellant.**

No. C9–88–662.

Supreme Court of Minnesota.

Jan. 5, 1990.

As Amended on Denial of Rehearing Jan. 30, 1990.

**914**

Lawrence J. Field, Harold D. Field, Marc D. Simpson, Leonard, Street & Deinard, and Henry H. Feikama, and Stacey A. Dekalb, Smith, Juster, Feikama, Malmon & Haskvitz, Minneapolis, for petitioner, appellant.

Craig W. Gagnon, Mark P. Wine, and David L. Bishop, Oppenheimer, Wolff & Donnelly, Minneapolis, for Hydra–Mac, Inc.

John Q. McShane, Janice K. O'Grady, and Lezlie Ott Marek, Bowman and Brooke, Minneapolis, for Intern. Harvester Co.

KELLEY, Justice.

Hydra–Mac, Inc. (Hydra–Mac), the manufacturer of a gear driven skid loader, and respondent International Harvester Company (International Harvester), a purchaser from Hydra–Mac of a number of skid loaders, instituted this joint action against the appellant Onan Corporation (Onan), the manufacturer and seller of an engine incorporated into the skid loaders. International Harvester asserted damage claims arising from alleged breach of warranty. Onan defended by asserting a disclaimer of warranties and by alleging that most, if not all, of the plaintiffs' claims were barred by the statute of limitations. The jury returned a special verdict favoring the plaintiffs on all claims and assessed both compensatory and punitive damages—the latter to Hydra–Mac only.[1] The trial court denied Onan's alternative post trial motions for summary judgment, judgment notwithstanding the verdict, for a new trial, for additional findings of fact, and for a remittitur. In affirming this trial court decision, the court of appeals panel held that the terms of Onan's warranty disclaimers were

---

**1.** In this action, Hydra–Mac, as indicated, claimed that Onan had breached warranties to it and additionally had made fraudulent misrepresentations. International Harvester alleged that it was a third party beneficiary of warranties from Onan to Hydra–Mac which Onan had breached. Both won on all counts in the trial court and in the court of appeals. Onan and Hydra–Mac subsequently entered into a settlement agreement and Hydra–Mac was dismissed from this suit, and with its dismissal, the fraud and punitive damage issues were removed from the case. The only issues now pending in this appeal relate to Onan's warranty disclaimer, its statute of limitations defense, and the lost profit issues as they pertain to the claims of International Harvester against Onan.

inapplicable to either plaintiff; that the statute of limitations was not a bar to any of the claims because (a) Onan had waived it, or (b) was estopped from asserting it, or (c) it was tolled by Onan's conduct; and that sufficient evidence supported the jury's award of lost profits. *Hydra–Mac, Inc. v. Onan Corp.*, 430 N.W.2d 846, 851–56 (Minn.App.1988), *pet. for rev. granted* (Minn., Jan. 13, 1989). We affirm in part, reverse in part, and remand for further proceedings.

Onan manufactures engines and generators which it markets worldwide. Hydra–Mac was a small manufacturer of skid loaders—four wheeled vehicles whose right and left sides can be controlled independently of each other, thereby permitting the machine to turn by skidding. Onan, which for some time had supplied engines to Hydra–Mac, in 1975 recommended its new NHCV engine to Hydra–Mac for use in a Model 8C skid steer loader Hydra–Mac was then developing. Onan represented to Hydra–Mac that the NHCV engine was reliable, durable, would cool better than other engines, and was suitable for use in the new skid loaders. In reliance on those representations, Hydra–Mac selected Onan's NHCV aluminum engine for incorporation into its new Model 8C skid loader. Onan delivered to Hydra–Mac 2,556 NHCV engines between November 1975 and July 1979.

In 1975 International Harvester contracted with Hydra–Mac for the latter to manufacture for it skid loaders incorporating Onan's NHCV engine. International Harvester marketed those skid loaders as its Model 4130 skid loader. When it signed the contract, International Harvester was aware that problems relating to engine power, head gasket failure, and high oil consumption were being experienced in skid loaders containing the Onan NHCV engine. Nonetheless, it entered into the contract based on assurance from both Onan and Hydra–Mac that the engine problems would be solved. In a meeting held on December 3, 1976, Onan told International Harvester that the problems were just start-up assembly line "glitches" and that design changes were in progress. International Harvester acknowledged the problem in a pre-shipment audit in early 1977 and then later in February of 1977, when it accepted its first shipment of skid loaders which contained the Onan NHCV engine. Ultimately, 1,045 Model 4130 skid loaders were purchased by International Harvester for resale through its dealer network.

Shortly after the first retail sale, International Harvester began to receive repeated complaints about engine failure, blown head gaskets, excessive heat, low power production, and cylinder head warping. International Harvester and Onan discussed these engine problems repeatedly. In attempts to remedy the various problems, between 1977 and 1979 Onan introduced a variety of "fix-it" programs, none of which were completely successful. In early 1977 Onan replaced the washer in the gasket heads; later that year it changed from a side draft carburetor to a down draft carburetor with a longer chamber head and recommended a new tune-up procedure. Even later, Onan suggested still another change—this time in the head retention hardware and torquing procedures. In February of 1978, Onan began to include a limited warranty and a disclaimer provision on the back of its invoices to Hydra–Mac.

In June of 1979 Onan informed International Harvester that the NHCV engine would never be totally free from heat problems and that a different engine should be used. Although International Harvester then stopped ordering the skid loader, it continued to expect that engines still in inventory and in the field could be made serviceable by what was called a graphoil fix. Earlier that year, Onan had instituted a testing program in an attempt to develop a final solution to the problems the engine was experiencing. The testing resulted in Onan suggesting the use of a graphoil gasket in existing engines. The graphoil fix, known as the C–127 field change package, became available to International Harvester customers in June of 1980 but it, too, proved to be an ineffective solution to the recurring problems.

Trial evidence demonstrated that the NHCV engine had inherent design defects

that could not be remedied by repairs. Evidence also indicated that Onan endorsed the use of its NHCV engine in the 8C skid loader even though its own sales engineer, who serviced the Hydra–Mac account, believed the engine was not ready for that application. Moreover, the evidence demonstrated that Onan had failed to inform International Harvester of a 1975 internal study which indicated that the NHCV engine might experience problems of excessive heat unless Onan utilized a stronger aluminum or cast iron in its construction, but that Onan had rejected the suggested material switch because of the high cost involved.

At trial, in its special verdict, the jury ruled in favor of International Harvester on its claims. It found International Harvester had sustained general damages for unreimbursed expenses incurred in its attempt to repair and retrofit the Model 4130 steer loaders in the amount of $635,891 and had sustained lost profits of $2,751,000.

■ 1. On appeal Onan asserts that its disclaimer of all express and implied warranties on the back of sales invoices delivered to Hydra–Mac with the engines, defeats International Harvester's claim that it may recover damages from Onan as a third party beneficiary of product warranties made by, or attributable by law to Onan.

Under Minn.Stat. § 336.2–318 (1988)[2] warranties made by Onan extend "to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by the breach of warranty." Thus, the trial court's ruling that International Harvester, as purchaser of the skid loader containing the Onan engine, was a third party beneficiary of any warranties running to Hydra–Mac was proper, and appellant does not seem to challenge that ruling. But, as beneficiary of those warranties, International Harvester is equally subject to any disclaimers of warranty which would have been effective to bar any of Hydra–Mac's claims. As a seller, Onan may disclaim both express and implied warranties. Minn.Stat. § 336.2–316 (1988). A valid disclaimer extends to the original purchaser as well as to all parties covered as third party beneficiaries. Minn.Stat. § 336.2–318, U.C.C. Comment 1 (West 1966). *See also Western Equip. Co. v. Sheridan Iron Works,* 605 P.2d 806, 810 (Wyo.1980).

Although Onan concedes that it extended a limited warranty to ultimate consumers (farmers and industrial users), it asserts that to preclude all other parties from asserting warranty claims against it, after February 1978, it included a disclaimer on the back of each sales invoice delivered with engines to Hydra–Mac. This disclaimer appears in paragraph six of fifteen paragraphs on the back of each invoice.[3] Whether Onan's disclaimer applies to Hydra–Mac, and, therefore, to International Harvester as a third party beneficiary, involves an interpretation of the scope of the warranty. While the language employed should be given its plain meaning, *Bobich v. Oja,* 258 Minn. 287, 294, 104 N.W.2d 19, 24 (1960), it should never be interpreted in isolation, but rather in the context of the entire agreement. *Metro Office Parks Co. v. Control Data Corp.,* 295 Minn. 348, 352, 205 N.W.2d 121, 124 (Minn.1977). Unless

**2.** Minnesota's version of the Uniform Commercial Code is found in chapter 336 of the Minnesota Statutes, and it may be cited as the Uniform Commercial Code. *See* Minn.Stat. § 336.1–101 et seq. (1988).

**3.** The warranty disclaimer reads, insofar as applicable:

6. *Warranty, Limitation of Liability and Notice of Claims.*

A. *Warranty.* Onan extends to the original purchaser of goods for use, Onan's current Limited Warranty, a copy of which has been provided to Purchaser and a copy of which will ac-

company the product. THERE IS NO OTHER EXPRESS WARRANTY.

IMPLIED WARRANTIES INCLUDING MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE LIMITED TO PERIODS OF WARRANTY SET FORTH IN THE PRINTED WARRANTY AND TO THE EXTENT PERMITTED BY LAW, ANY AND ALL IMPLIED WARRANTIES ARE EXCLUDED.

B. *Limitation of Liability.* Onan's sole liability and Purchaser's sole remedy for a failure of goods to perform as warranted shall be limited to the repair or replacement of goods returned to Onan's factory * * *.

ambiguity exists, generally the construction and effect of contract language is a question of law. *Westphal v. Anderson,* 347 N.W.2d 85, 87 (Minn.App.1984). We agree with the court of appeals that as a matter of law the plain meaning of Onan's disclaimer was that it be applied to the ultimate user and not to Hydra–Mac, nor, therefore, to International Harvester. We also note that even should the language employed be considered ambiguous, the same result would follow under the axiom that a contract will be construed against the drafter. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979).

In dispute is whether the term "Purchaser" in the warranty provision refers to Hydra–Mac and, as a consequence thereof, the remainder of the disclaimer also applies to International Harvester as the third party beneficiary. Throughout the fifteen paragraphs on the back of the invoice, Hydra–Mac is referred to as "buyer" twenty-three times and on the front of the invoice Hydra–Mac is referred to as "customer" three times. The only time the word "purchaser" appears on the invoice is in the warranty provision, paragraph six. In 6.A. "purchaser of goods for use," not the "Buyer," is addressed. Onan admits that the Limited Warranty provision in paragraph six applies only "to the original purchaser of goods for use,"—the ultimate consumer—and does not apply to Hydra–Mac or International Harvester. However, it further contends that although the limited warranty does not apply to Hydra–Mac, the rest of the provision, the disclaimer, does. We reject this contention. The disclaimer language is actually a portion of the limited warranty provision and appears to be intended to apply only the ultimate consumer. To claim that the rest of the disclaimer applies to Hydra–Mac, a party that is not an ultimate user and not covered by the disclaimer, appears to us to be illogical.

■ Even were we to accept Onan's contention that the disclaimer was intended to apply to Hydra–Mac and third party beneficiaries, Onan made inconsistent express warranties which supersede the dis-

claimer. When terms of an express warranty and a disclaimer cannot be reconciled, the language of the express warranty prevails. *Wenner v. Gulf Oil Corp.,* 264 N.W.2d 374, 384 (Minn.1978). Here the jury found that Onan made express warranties, beginning in 1976, relative to the capability of the engine, and then later warranted that the "fixes" would solve the problems being encountered in the field. The jury also found that those warranties were breached. Whether an express warranty has arisen from the language used in the circumstances of the relationship of the parties, and whether such warranties have been breached, are jury questions not to be disturbed by a reviewing court unless there exists insufficient evidence as to the terms of the warranty. *Northern States Power Co. v. ITT Meyer Industries,* 777 F.2d 405, 411 (8th Cir.1985) (applying Minnesota law). Though disputed, the evidence in this case clearly supports the jury's verdict. Thus, since the jury-found express warranties prevail over any seller disclaimers, an additional reason exists for rejecting Onan's invoice disclaimer defense.

2. In its answer to the complaint, Onan appropriately pleaded the statute of limitations, as required by Minn.R.Civ.P. 8.03, by asserting that all claims which arose from sales made prior to July 21, 1979—a date four years preceding the commencement of this action—were barred. The Uniform Commercial Code contains a four-year statute of limitations which commences to run when the cause of action accrues. Minn. Stat. § 336.2–725(1), (2) (1988). The action accrues upon tender of delivery, or, as was the case here, on delivery of the engines to Hydra–Mac under Minn.Stat. § 336.2–725(2). Thus, in the instant case, claims based upon breach of warranty arising from sales made before July 21, 1979, would be barred.

■ (a) Because they concluded that by its conduct Onan had waived the defense, both courts below ruled that the statute of limitations did not bar recovery by International Harvester. We disagree.

The burden of proving that the protection of the statute is available rests upon

the party asserting it; usually, as here, the defendant Onan. In this case, it is undisputed that Onan not only pled the statute of limitations, but, in addition, at trial Onan proved it by placing in evidence invoices which listed the delivery dates of the engines. Clearly, that evidence is more than adequate to meet Onan's burden of proving tender of delivery, the event which, under the U.C.C., triggers the running of the statute of limitations.

But, International Harvester complains, because during the course of trial proceedings Onan did not thereafter refer to the defense by name, it should now be held to have waived it. In particular, International Harvester cites Onan's failure to mention the defense in its pre-trial statement. While we acknowledge that we are troubled by Onan's omission to list the statute of limitations defense in its pre-trial statement, and while we do not condone a party's omission to fully and adequately inform the court and opposing parties of its contentions in a pre-trial statement, and while we reserve to another day a determination whether failure to give notice of a party's defense in a pre-trial statement may even, in appropriate circumstances, result in a waiver of such omitted claim or defense, in this case we reject International Harvester's waiver assertion.

No trial court finding exists to support the conclusion that Onan's omission was intentionally made, that either the court or the plaintiffs were misled, or that the omission on the pre-trial statement was prejudicial to International Harvester. Absent a finding of intentional omission, none of the sanctions of Minn.R.Civ.P. 16.06 would bar an assertion of a claim otherwise properly pleaded and proved. No other Minnesota Rule of Civil Procedure provides that mere omission to mention a claim on defense in a pre-trial statement, in and of itself, constitutes a waiver or abandonment of the defense. Moreover, the pleadings cannot be ignored by a trial court when it determines the rights of the parties. *See, e.g., Christenson v. Argonaut Ins. Cos.*, 380 N.W.2d 515, 520 (Minn.App.1986), *pet. for rev. denied* (Minn., March 27, 1986). Onan plead-

ed the defense and produced evidence to prove it.

(b) Further, we note the absence of any evidentiary support for the trial court's conclusion that by Onan's "concealment" Onan had waived the defense. In fact, the evidence clearly establishes that International Harvester and Hydra–Mac and the court knew that Onan's statute of limitations defense was an issue. Both International Harvester and its then co-plaintiff, Hydra–Mac, acknowledged the existence of the claimed defense either in the pre-trial hearing statement or in trial briefs handed to the judge. No one could have been misled or prejudiced by Onan's alleged "concealment."

In that connection, the reliance of the court of appeals' panel on *McMahon v. Eli Lilly & Co.*, 774 F.2d 830 (7th Cir.1985) is inapposite. There the facts differed substantially from those existing in this case. In *McMahon*, in response to a specific, direct inquiry by the trial judge to defense counsel asking whether the defendant was relying on a statute of limitation defense, counsel provided an evasive response (in effect, "maybe yes, and maybe no") which, when coupled with failure to list it in a pre-trial submission, the court found supported a waiver by concealment. *Id.* at 837–38. Unlike the defendant in *McMahon*, Onan did not mislead counsel or the court by any equivocation in response to a direct question.

(c) International Harvester, in addition, claims that even if Onan did not waive its statute of limitations defense, Onan now is estopped by its actions from raising that defense because Onan's continuing promises to repair likewise support the application of the doctrine of fraudulent concealment. Fraudulent concealment tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect. *See, e.g., Holstad v. Southwestern Porcelain*, 421 N.W.2d 371, 374 (Minn.App.1988), *pet. for rev. denied* (Minn., Apr. 28, 1988). However, it does so only if it is the very existence of the facts which establish the cause of action which are fraudulently con-

cealed. *Wild v. Rarig*, 302 Minn. 419, 450–51, 234 N.W.2d 775, 795 (1975) *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Merely establishing that a defendant had intentionally concealed the alleged defects is insufficient; the claimant must establish that it was actually unaware that the defect existed before a finding of fraudulent concealment can be sustained. *Mutual Serv. Life Ins. v. Galaxy Builders*, 435 N.W.2d 136, 139 (Minn.App.1989), *pet. for rev. denied* (Minn., Apr. 19, 1989).

International Harvester does not argue that the defective nature of the NHCV engines was concealed by Onan. To the contrary, the evidence indisputably establishes that as early as 1975 International Harvester was aware of existing and potential problems with the NHCV engine. Rather, International Harvester's claim, concurred in by the courts below, is that Onan fraudulently concealed the permanence of the problem by failing to advise Hydra–Mac and/or International Harvester that the engines could never be repaired to the point of remedying the defects inherent in them. We disagree. International Harvester, as well as Onan, knew that after each "fix" that the performance problems continued. Onan specifically informed International Harvester in June of 1979 that the NHCV engines would never be totally free from problems. Thus, International Harvester had information that it may have had a cause of action for defective engines from the inception of the arrangement with Hydra–Mac until it commenced this lawsuit. A party need not know the details of the evidence establishing the cause of action, only that the cause of action exists. When a party has this knowledge, " 'it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claim.' " *Wild v. Rarig*, 302 Minn. at

451, 234 N.W.2d at 795 (quoting 54 C.J.S. *Limitation of Actions* § 89 (1987)). The existence of evidence rebutting International Harvester's claim that it was unaware of the permanency of the defects because of "concealment" precludes a trial court ruling that as a matter of law the alleged "concealment" tolled the statute of limitations.

International Harvester argues that the doctrines of equitable estoppel and tolling should be employed to prevent Onan from avoiding liability through assertion of the statute of limitations. We have never specifically held that promises by a seller to make repairs may give rise to equitable estoppel or toll the statute of limitations. Because we find the arguments concerning equitable estoppel persuasive, we decline to address whether the statute of limitations was tolled by Onan's promises to repair.[4]

 A party seeking to invoke the doctrine of equitable estoppel has the burden of proving three elements: (1) that promises or inducements were made; (2) that it reasonably relied upon the promises; and, (3) that it will be harmed if estoppel is not applied. *Northern Petrochemical Co. v. U.S. Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn.1979). A consideration of primary relevance to the second requirement involves an inquiry respecting the diligence of the claimant in asserting its action—or, in other words, were its actions or inactions relating to timely assertion of its claims reasonable when viewed in the light of all existing circumstances? Thus, invocation of equitable estoppel may be denied when the party asserting it has failed to exercise due diligence in filing its action *after the grounds giving rise to the claimed estoppel have ceased to exist. See, e.g., Northern Petrochemical*, 277 N.W.2d at 411.

---

**4.** The so-called "repair theory" has not been afforded universal acceptance. *See, e.g., Triangle Underwriters v. Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir.1979) (seller's attempt to repair did not toll statute of limitations); *Tomes v. Chrysler Corp.*, 60 Ill.App.3d 707, 710, 18 Ill.Dec. 71, 74, 377 N.E.2d 224, 227 (1978) (efforts to repair do not toll the statute of limitations). Other jurisdictions likewise appear to have re-

jected the repair theory. *See, e.g., Zahler v. Star Steel Supply Co.*, 50 Mich.App. 386, 390, 213 N.W.2d 269, 270 (1973); *Binkley Co. v. Teledyne Mid-America Corp.*, 333 F.Supp. 1183, 1187 (E.D.Mo.1971), *aff'd*, 460 F.2d 276, 277 (8th Cir. 1972); *Biocraft Laboratories, Inc. v. USM Corporation*, 163 N.J.Super. 570, 572, 395 A.2d 521, 522 (A.D.1978).

Assuming promises to repair provide a basis for estoppel, we decline to come to that conclusion in this case without further trial court findings concerning due diligence. Were we to hold that equitable estoppel applied in this case, we would negate the requirement that an equitable estoppel claim analysis must address the reasonableness of the promisee's reliance which, as indicated, encompasses an examination into whether the one asserting the estoppel used due diligence in initiating its claim after it knew, or should have known, that further reliance was unjustifiable. In our opinion this analysis is necessary to prevent one inequity (the alleged false repair promises) from being treated by another (automatic bar even though had the promisee proceeded with due diligence in asserting its claim, there would have resulted no prejudice to it).

The trial court did not specifically address the issue of International Harvester's diligence, or lack thereof.[5] Obviously, what constitutes due diligence is fact specific and is best left to the trier of fact. In the instant case, evidence demonstrates that International Harvester continued to press Onan for repairs as late as January 1982, and that the C–217 field fix was not completed until later, and, the record is unclear how long it took International Harvester to realize the fix was also ineffective. Other evidence, however, suggests that sometime in 1979 Onan informed International Harvester it would no longer cover claims on engines it sold before August 1, 1978, and as well that Onan admitted to International Harvester as early as 1979 that the engines could never be totally without problems—at a time when between 19 and 27 months remained of the unexpired statute of limitation period. From these facts, as well as perhaps others, it appears clear that a dispute does exist as to whether International Harvester used due diligence in bringing this suit as to all, or as to a portion of, its claims. Therefore, it is necessary to remand this case to the

trial court for submission of that fact issue to the jury.

Should, on remand, the trier of fact find that International Harvester failed to use due diligence in commencing the suit after the grounds for estoppel ceased—when it became aware the engines were irreparable—all affected claims would be barred. It is possible that the fact finder could conclude that International Harvester acted with diligence as to some claims but not as to others. Thus, International Harvester is entitled to damages arising from deliveries of engines made within the four-year period immediately antedating commencement of this action as well as for claims diligently brought.

■ 3. In its final challenge to the decision of the court of appeals' panel, Onan contends that the panel erred in concluding that the record contained sufficient evidentiary support for the jury's assessment of International Harvester's loss of profit damage award in the amount of $2,175,000. Onan concedes, as it must, that lost profits for breach of warranty are recoverable as compensable damages so long as they are foreseeable by the seller. *See* Minn.Stat. §§ 336.2–714, 336.2–715 (1988); *Bemidji Sales Barn v. Chatfield*, 312 Minn. 11, 15, 250 N.W.2d 185, 188 (1977). To recover, International Harvester has the burden of proving to a reasonable certainty that it suffered consequential damages and, as well must establish the amount of those damages to a reasonable probability. *Jacobs v. Rosemount Dodge—Winnebago S.*, 310 N.W.2d 71, 78 (Minn.1981). Onan, on appeal, contends that International Harvester did not do so.

International Harvester's proof relating to its lost profit claim came primarily from evidence presented by its comptroller, Stanley West. In arriving at his lost profit figure, West made a comparison of International Harvester's sales to the total sales made by the industry in the relevant years. The industry-wide sales figures he used in

---

**5.** The court of appeals' panel, relying upon its case entitled *Sohns v. Pederson*, 354 N.W.2d 852, 855 (Minn.App.1984) held, with little analysis of the due diligence requirement, that the promises

themselves are enough to toll the statute. As indicated, we deem this not to be a tolling question but rather an estoppel issue.

his computations were derived from data supplied by the Farm Implement Equipment Institute (F.I.E.I.), an organization which compiles data based on voluntary submissions of sales statistics by manufacturers in the industry. Through West, International Harvester established that in 1977 it had a 4.2 percent share of the skid loader market. He testified that had International Harvester not experienced the multiple NHCV engine problems in succeeding years, it would have at least maintained that relative market share. Instead, he observed, the actual market share International Harvester had in subsequent years was significantly less.[6] He attributed this decline in market share directly to the various engine problems being experienced in the Onan engine. West translated the lost market share, which he had calculated, in part, from the F.I.E.I. information, into lost unit shares and came up with a figure of $2,751,000 in lost profits. Other factors, which might have caused the decline in International Harvester's sales, such as an agricultural recession then existing, were thus taken into account as those factors would remain constant for all suppliers. From the figures so computed, West then deducted International Harvester's costs of sales.

We conclude, as did the court of appeals' panel, although with considerable reluctance, that this evidence corroborated in part, at least, by anecdotal testimony from others relative to the issue, was adequate to withstand Onan's post-trial challenges to the verdict on the grounds of alleged insufficiency of the evidence. By evidence presented through West and others, International Harvester provided a sufficient basis to support a reasonable inference that its claim for lost profits resulted directly from Onan's breach of warranties and the engine defect problems. Onan presented no evidence on the issue to rebut that inference. *See LeSueur Creamery, Inc. v. Haskon, Inc.,* 660 F.2d 342, 351 (8th Cir. 1981) (applying Minnesota law), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1716, 72

L.Ed.2d 138 (1982). The law does not require mathematical precision in proving lost profits—only proof to a reasonable certainty. *Duchene v. Wolstan,* 258 N.W.2d 601, 606 (Minn.1977) (citing *Northern Petrochem. Co. v. Thorsen & Thorshov, Inc.,* 297 Minn. 118, 125, 211 N.W.2d 159, 166 (1973)). In this case the trial judge conducted an extensive voir dire out of the presence of the jury into the background and qualifications of West and the reliability of the F.I.E.I. data upon which West strongly relied in formulating his analysis of International Harvester's lost profits. Though we concede that Onan's claim of insufficiency of the evidence is not completely meritless, we nonetheless are unable to hold that the trial court abused the discretion the law places in it when, after extensive voir dire, it admitted West's evidence; nor can we conclude that the trial court's denial of Onan's post trial motions on the lost profit issue was clearly erroneous.

However, we do take this opportunity to reaffirm our holding in *Polaris Industries v. Plastics, Inc.,* 299 N.W.2d 414, 419 (Minn.1980), where we cautioned that industry-wide sales figures computed from *voluntarily* submitted information generally lack sufficient reliability for admission. Though, in this case, we are bothered by the fact that the F.I.E.I. report was subject to some of the infirmities we noted in *Polaris,* 299 N.W.2d at 419, International Harvester did present evidence which permitted the trial court, in its discretion, to conclude that the report, as adjusted by the witness for variables, had sufficient evidentiary trustworthiness to permit its admission in connection with West's testimony. Moreover, Onan was afforded largely unfettered cross-examination into the reliability of West's conclusions, and, even though no restrictions were placed on Onan from offering evidence rebutting West's conclusions, for whatever reason it did not do so. Thus, on remand, should the jury find that International Harvester exercised due diligence in instituting the suit with respect to

---

**6.** International Harvester's relative market shares in subsequent years was 1978—3.2 percent; 1979—2.7%; 1980—2.3 percent; 1981—2.8

percent; 1982—2.4 percent; 1983—1.3 percent; 1984—0.28 percent).

the breach of warranty claims emanating from all sales of engines by Onan to Hydra–Mac for incorporation into the International Harvester Model 4130 skid loaders, the judgment will remain undisturbed.

However, we note that the damage award of the jury in no way apportions International Harvester's profit loss to specific engines or groups of engines which had been incorporated into International Harvester's skid loaders. Therefore, should the trial court find that International Harvester failed to use due diligence in asserting claims of damages arising from breaches of warranty, it would be impossible to splinter in some manner the former gross loss of profit award to accommodate the finding. Because of the form of verdict, it would be equally difficult to apportion the general damages. Therefore, in the event that it be determined that any portion of International Harvester's claim is barred by expiration of the statute, the judgment on the verdict, respecting damages, must be vacated and the jury must assess damages anew based upon all relevant evidence.

We remand to the trial court for new trial in which the only issues will relate to whether International Harvester exercised due diligence in commencing suit after it knew, or should reasonably have known, that Onan's warranties respecting repairs had been breached. If the jury finds that International Harvester used due diligence, then equitable estoppel bars Onan's statute of limitation defense and the judgment against Onan is affirmed. If the jury finds International Harvester did not commence the action with due diligence, the damage issue shall be vacated and the jury shall reassess International Harvester's damages based on all evidence presented relevant to the issue.

SIMONETT, J., files an opinion concurring specially, joined by WAHL and KEITH, JJ.

SIMONETT, Justice (concurring specially).

I join the court's opinion in all respects except I would handle the remand differently.

The key fact issue remaining unresolved is whether plaintiff International Harvester used due diligence in asserting its breach of warranty claims after it knew or should have known that its reliance on Onan's repair promises was no longer justified. I would remand for the trial court to decide this issue. If due diligence is found, that would end the litigation; if found to be lacking, then a new jury trial should be ordered on lost profit damages.

This was a long, complex trial, ably tried by the judge and counsel, and the time and expense involved in what would be essentially a retrial should be avoided, if it may not be necessary. Minn.R.Civ.P. 49.01 provides:

> If [in submitting the special verdict] the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand, the court may make a finding * * *.

Pursuant to this rule, I would have the trial judge now make findings on the due diligence issue based on the trial record. *Cf. Lemmer v. IDS Properties, Inc.,* 304 N.W.2d 864, 870 (Minn.1980). If the damages issue needs to be redetermined, there would then be a new trial with a jury.

WAHL, Justice (concurring specially).

I join the special concurrence of Justice Simonett.

KEITH, Justice (concurring specially).

I join the special concurrence of Justice Simonett.