DAKOTA BANK, Appellant,

v.

Carl EIESLAND, et al., Respondents.

No. C0–01–1941.

Court of Appeals of Minnesota.

June 11, 2002.

Susan E. Barnes, Sarah B. Stroebel, Lindquist & Vennum, Minneapolis, MN, for appellant.

Thomas P. Kane, Hinshaw & Culbertson, Minneapolis, MN; and Edward J. Rolwes, Rosenblum, Goldenhersh, Silverstein & Zafft, P.C., St. Louis, MO, admitted pro hac vice, for respondents.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Considered and decided by HANSON, Presiding Judge, SCHUMACHER, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.*

Appellant bank's claims of respondent accountants' negligent and intentional misrepresentations, based on reliance on information contained in financial compilations prepared by respondents, were dismissed by the district court for failure to state claims on which relief can be granted. Appellant, in challenging that dismissal, argues that (a) the disclaimer should not shield accountants who knew or should have known the information was false and (b) where accountants affirmatively represent that they have complied with specific professional standards, they should be held liable for failure to comply with those standards. Because appellant's complaint fails to state a claim of negligent misrepresentation on which relief can be granted, but does state a claim of intentional misrepresentation upon which relief may be granted, we affirm in part, reverse in part, and remand.

## FACTS

E.T. Technologies, Inc. (ETT), an equipment supplier, was owned by Eric Eiesland. On March 21, 1997, ETT and Eric Eiesland entered into several agreements with appellant Dakota Bank (Dakota), including a $500,000 draw note and a commercial loan agreement. Eric Eiesland personally served as a guarantor of the loan and represented to Dakota that he needed financing to purchase equipment inventory. ETT's business consisted in large part, however, of brokering equip-

Minn. Const. art. VI, § 10.

ment or taking equipment on consignment; the business did not often directly purchase equipment to resell.

The loan agreement required that

[a]ll information that has been provided to Lender by or on behalf of [ETT and Eric Eiesland] is true and correct and does not and shall not omit any material fact necessary to make such information not misleading.

Before drawing on the available credit under the loan, ETT certified its current accounts receivable and inventory to Dakota. It could then borrow up to 70% of that amount.

At all times relevant to the complaint, respondents McCarthy, Pacilio, Eiesland & Gibbert, P.C. (MPEG), and Carl Eiesland, as a partner of MPEG, acted as certified public accountants for ETT. ETT's owner, Eric Eiesland, is the son of Carl Eiesland. Carl Eiesland and MPEG knew that ETT's financing was through Dakota, knew that ETT and Eric Eiesland were providing to Dakota financial statements that had been prepared by MPEG, and knew that Dakota relied on these financial statements when providing funds under the loan. Each of the compiled financial statements regarding ETT that were provided to Dakota included a cover letter that stated:

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial

statement and, accordingly do not express an opinion or any other form of assurance on them.

The cover letter also stated that MPEG was "not independent with respect to [ETT]." [1]

Carl and Eric Eiesland talked about ETT's business "quite often," "maybe once every couple weeks." Carl Eiesland and MPEG knew that ETT was required to certify to its accounts receivable in order to draw on the credit line.

The original note, issued on March 21, 1997, was renewed several times. The first renewal, on March 23, 1998, was based on a compiled financial statement for ETT dated February 10, 1998, for the period ending December 31, 1997. Respondents prepared that statement "in accordance with statements on Standards for Accounting and Review services issued by the American Institute of Certified Public Accountants." Dakota relied on that statement in extending credit by examining ETT's accounts payable and receivable, and inventory listed on the statement. The next three renewals of the note did not refer to the compiled financial statements, but relied on representations of ETT and Eric Eiesland about ETT's collateral value and Eric Eiesland's net worth. Dakota renewed the note on July 29, 1998, August 21, 1998, and October 8, 1998, based on those representations. Dakota extended the note through January 21, 1999, and ultimately through May 20, 1999.[2]

---

1. The parties, while noting in their appeal briefs the presence of this statement, raise no issue nor make any argument with reference to it. Accordingly, we do not address it.

2. On December 1, 1998, after the note had been extended through January 21, 1999, Dakota received a compiled financial statement prepared by MPEG for the period ending September 30, 1998. Dakota alleged in the com-

plaint that it "relied on this MPEG statement in determining to continue its relationship with [ETT]." On January 20, 1999, Dakota extended the note through May 20, 1999, without having yet received a later compilation dated February 22, 1999. The complaint alleged that this final extension was based on misrepresentations by ETT and Eric Eiesland and that Dakota "relied upon this [February

ETT defaulted on the note on May 21, 1999. Dakota was notified that ETT's collateral market value was, at most, $120,500, which was substantially less than the collateral market value of $931,147 reported in MPEG's financial compilation statement dated February 22, 1999. Subsequently, Eric Eiesland's debts, except for his personal guarantee on the note, were discharged in bankruptcy.

Dakota brought an action against MPEG and Carl Eiesland, alleging both intentional and negligent misrepresentation, and claiming that amounts represented on the non-audited compiled financial statements as accounts receivables were not true receivables or amounts that were ultimately owing or belonging to ETT.

The complaint alleges that Eiesland and MPEG knew or should have known that an inventory of consigned or brokered equipment was worth significantly less than inventory owned by a company; that the personal and business statements and other documents prepared by MPEG and submitted by Eric Eiesland and ETT to Dakota contained representations about the financial condition of ETT and Eric Eiesland relating to net worth, accounts receivable and payable, inventory, and other assets that were materially false when made; that because of Carl Eiesland's close familial ties and frequent contact with ETT's owner, Carl Eiesland and MPEG knew or should have known that those representations were materially false; and that Carl Eiesland and MPEG made the representations in the financial statements with the purpose and intention of deceiving Dakota to induce it to continue to extend or renew credit to ETT and to abate potential collection efforts.

The district court granted respondents' motion to dismiss for failure to state a

22, 1999] MPEG statement in continuing its

claim on which relief can be granted under Minn. R. Civ. P. 12.02(e). This appeal followed.

## ISSUE

Did the district court err by dismissing a complaint for failure to state a claim when the complaint states that the accountants knowingly made misrepresentations to a foreseeable third party in unaudited financial statements?

## ANALYSIS

■ A complaint failing to state a claim on which relief can be granted must be dismissed. Minn. R. Civ. P. 12.02(e). We review a complaint dismissed for that reason to determine "whether the complaint sets forth a legally sufficient claim for relief." *Elzie v. Comm'r of Pub. Safety*, 298 N.W.2d 29, 32 (Minn.1980) (emphasis omitted).

> A claim prevails against a motion to dismiss if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded.

*Geldert v. Am. Nat'l Bank*, 506 N.W.2d 22, 25 (Minn.App.1993) (citations omitted), *review denied* (Minn. Nov. 16, 1993). We must accept the allegations contained in the complaint as true. *Elzie*, 298 N.W.2d at 33. It is immaterial to our analysis whether the plaintiff can prove the alleged facts. *Id.* at 32.

Dakota has alleged both that respondents' actions constituted negligent misrepresentation and that they constituted intentional misrepresentation. We shall address each of these claims in turn.

■ With regard to negligent misrepresentations, Dakota relies on *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291

relationship with [ETT]."

(1976), to argue that unaudited accounting records can be deemed representations by accountants. In *Bonhiver*, the Minnesota Supreme Court applied section 552 of the Restatement (Second) of Torts to establish an accountant's liability to third parties for negligent misrepresentation. *Id.* at 121–22, 248 N.W.2d at 298–99. That section, entitled "Information Negligently Supplied for the Guidance of Others," provides:

(1) One who, in the course of his * * * profession * * *, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss *caused to them by their justifiable reliance upon the information,* if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1976) (emphasis added).

We agree with respondents that *Bonhiver* does not aid Dakota's argument on negligent misrepresentation. The *Bonhiver* court found liability where the third party (the department of insurance, which was examining the books of a company at the same time as the defendant accountants) relied on the working paper of the accountants, which did not rise to the level of a finalized report. *Bonhiver,* 311 Minn. at 119–20, 248 N.W.2d at 297. The accountants in *Bonhiver* spoke directly with the department's employees while they were working on the examination of documents, however, and told the department's employees that the information was correct. *Id.* at 122–23, 248 N.W.2d at 299. That situation does not exist here. Dakota's reliance on *Bonhiver* is misplaced.

There is no Minnesota law on point addressing whether a third party justifiably relies on unaudited, compiled financial statements in which the accountants have expressed no opinion. Several foreign jurisdictions have dealt with the matter, however, and have held that third parties do not justifiably rely on unaudited compiled financial statements where the statement contains a disclaimer. In *First Nat'l Bank of Newton Cty. v. Sparkmon,* the Georgia Court of Appeals held that under the Restatement (Second) of Torts § 552, professional liability for negligence is extended to foreseeable persons for whom the information was intended, either directly or indirectly, but that the duty to professionals may be

limited by appropriate disclaimers which would alert those not in privity with the supplier of information that they may rely upon it only at their peril.

*First Nat'l Bank of Newton Cty. v. Sparkmon,* 212 Ga.App. 558, 442 S.E.2d 804, 805 (1994) (citation omitted) (emphasis omitted). Similarly, in *Evans v. Israeloff, Trattner & Co.,* 208 A.D.2d 891, 617 N.Y.S.2d 899, 900 (1994), the New York Supreme Court, Appellate Division, held that in a fraud claim brought by third party, that party's reliance on unaudited financial statements containing alleged misrepresentations by accountants was not justified as a matter of law where the statements contained a disclaimer.

Here, our research has uncovered two cases that conflict with *Sparkmon* and *Evans.* In *Liberty Finance Co. v. BDO Seidman,* 123 N.C.App. 515, 473 S.E.2d 13, 13–

14 (1996), the third-party plaintiff lent money to a corporation based on the value of accounts receivable as reflected in unaudited financial statements prepared by the defendant-accountant for the corporation. Those statements provided no opinion on their accuracy and contained a disclaimer limiting the scope of the report. *Id.* at 14. The North Carolina Court of Appeals held that it was error to dismiss the claim, based on an accountant's negligence, for failure to state a claim because defendant-accountant could not prove, as a matter of law, that plaintiff did not justifiably rely, under the Restatement (Second) of Torts § 552, on the unaudited statements. *Id.* at 14–15.

Similarly, in *ML–Lee Acquisition Fund, L.P. v. Deloitte & Touche,* 320 S.C. 143, 463 S.E.2d 618 (1996), *aff'd in part and rev'd in part on other grounds,* 327 S.C. 238, 489 S.E.2d 470 (1997), the South Carolina Court of Appeals held that an accountant's "comfort letter," provided to a third-party lender by the accountant's client to satisfy a condition of a loan that certain financial issues be explained, did not require a finding as a matter of law that the lender's reliance on the letter was not justified under the restatement section 552, despite the fact that it contained a disclaimer.

Here, the district court dismissed Dakota's negligent misrepresentation claim because, as a matter of law, Dakota could not predicate its claim on justifiable reliance on a financial compilation where a disclaimer is attached that states:

> A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statement and, accordingly do not express an opinion or any other form of assurance on them.

We find *Sparkmon* and *Evans* to be the more persuasive authority on the issue of negligent misrepresentation. Unlike an audit, a compilation, by its very nature, does not involve an independent examination by the accountant of the financial information on which the financial data provided by the client is based. Unaudited financial statements are merely compilations of information obtained from the audited party and, as such, do not reflect the professional opinion of the compiling party. In this instance, the disclaimer, in clear and unambiguous language, warned any party seeking to rely on the compiled information of the severe, if not complete, limitations placed on such reliance.

By contrast, we do not find *Liberty Finance* and *ML–Lee* persuasive. In both cases, the courts did not analyze the language contained in the disclaimer. Further, in *ML–Lee,* the comfort letter was written specifically for the third-party loan by the accountant. 463 S.E.2d at 630. We find that the language in the disclaimer here is specific and warned the bank of the very problem of which it complains. Minnesota law recognizes the validity of specific disclaimers. *See, e.g., Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 830 (D.Minn.1989) (franchises did not justifiably rely upon franchisors' representations regarding costs, in light of specific disclaimer in offer concerning variances in those costs and advice to prospective franchisees to contact qualified professionals to make independent survey of those expenditures).

■ We cannot conclude our discussion of negligent misrepresentation without addressing a further argument raised by Dakota. MPEG explicitly stated in its unaudited financial statements that it abided by the standards established by the American Institute of Certified Public Accountants

(AICPA). Section 100.07 of the AICPA Professional Standards provides:

> The accountant should possess a level of knowledge of the accounting principles and practices of the industry in which the entity operates that will enable him or her to compile financial statements that are appropriate in form for an entity operating in that industry.

Dakota argues that respondents failed to recognize that in the business operated by ETT and Eric Eiesland, inventory of consigned or brokered equipment is worth significantly less than inventory owned by the company. Therefore, argues Dakota, respondents did not possess or employ a sufficient level of knowledge of ETT's industry.

Section 100.09 of the standards provides:

> The accountant is not required to make inquiries or perform other procedures to verify, corroborate, or review information supplied by the entity. However, the accountant may have made inquiries or performed other procedures. The results of such inquiries or procedures, knowledge gained from prior engagements or the financial statements on their face may cause the accountant to become aware that information supplied by the entity is incorrect, incomplete, or otherwise unsatisfactory. In such circumstances, the accountant should obtain additional or revised information. If the entity refuses to provide additional or revised information, the accountant should withdraw from the engagement.

Dakota argues that under section 100.09 respondents failed to comply with the duty to obtain additional information.

With regard to the claim of negligent misrepresentation, we conclude that Dakota's argument of noncompliance with AICPA standards must fail. While we do not adopt the reasoning of the district court that these standards are aspirational only, and therefore could not have been violated[3], we do agree with the court's conclusion that even if the AICPA standards could be and were violated, the disclaimers that accompanied the compilations in this case prevented any justifiable reliance by Dakota on the representations contained in those compilations. *See Sparkmon*, 442 S.E.2d at 805–06 (disclaimer precluded justifiable reliance claim for negligent failure to comply with AICPA standards for compilations despite fact that accountants stated in compilations that they complied with standards). Therefore, we conclude that the district court correctly dismissed Dakota's claim of negligent misrepresentation on the part of respondents.

The question of whether the district court also correctly dismissed the intentional misrepresentation claim[4] re-

---

**3.** Dakota argues that although the AICPA standards are not mandatorily imposed on accountants, accountants who voluntarily represent that they have adhered to the standards should be held to that representation. We do not reach the question of whether AICPA standards can be violated, and if so, what consequences might ensue.

**4.** Intentional misrepresentation claims require plaintiffs to allege that the defendant (1) made a representation (2) that was false (3) having to do with a past or present fact (4) that is material (5) and susceptible of knowledge (6) that the representor knows to be false or is asserted without knowing whether the fact is true or false (7) with the intent to induce the other person to act (8) and the person in fact is induced to act (9) in reliance on the representation (10) that the plaintiff suffered damages (11) attributable to the misrepresentation. *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn.1992) (citation omitted). Misrepresentations may be made by either making an affirmative statement that is itself false, or concealing or not disclosing certain facts that render the facts that are disclosed mis-

mains, however, and is a troubling one. *Sparkmon* and *Evans* offer scant assistance to us on this issue. *Sparkmon* involved a claim of negligent misrepresentation only. It is not clear whether the claim in *Evans* included intentional misrepresentations on the part of the accountants. This case involves a claim based on the intentional misrepresentation of the accountants. Notably, this case also involves a close familial relationship between Carl Eiesland, the accountant working on the compilations, and Eric Eiesland, the owner of the company for which the compilations were being prepared.

We find support for our position in *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir.1989). Although the jurisdiction in which the case arose did not follow the restatement rule in determining the liability of professionals to third parties, the Seventh Circuit held that a fraud claim could stand where the accountant knew the statement was fraudulent and would be relied on as accurate, despite the fact that an accountant's "special accrual statement" was not audited and contained a disclaimer disavowing any assurance of accuracy. *Id.* at 1284–85.

MPEG prepared financial statements on behalf of ETT and Eric Eiesland. The accountant who worked on the financial statements was the father of the owner of that closely held corporation. The complaint asserts that Eric Eiesland and his father, the accountant, had close personal contact regarding the nature of the business, Eric Eiesland's business practices regarding inventory and accounts payable and receivable, and Dakota's loans. The complaint alleges that because of the father/son relationship, the frequent contacts between the accountant and the company's owner, and the special knowledge gained from discussions about the son's business, MPEG knew that those financial statements contained false information about the value of ETT's inventory and accounts receivable, and Eric Eiesland's net worth. The complaint also alleges that MPEG had actual knowledge that the statements were going to be relied on by Dakota in its credit determinations.

As noted, for purposes of a rule 12 motion to dismiss, allegations in a complaint must be accepted as true. *Elzie*, 298 N.W.2d at 33. Whether Dakota can produce evidence to substantiate those allegations is not a question properly addressed at this early stage of a proceeding. *Id.* at 32. We conclude that under the particular circumstances of this case, however, Dakota is entitled to go forward with discovery and other further proceedings in an attempt to meet its burden of showing intentional misrepresentation.

Further, the disclaimer, which was so important in our analysis of negligent misrepresentation (and to the relevancy of compliance with AICPA standards) will not absolve MPEG of liability against the intentional misrepresentation allegations. *See Ashland Oil*, 875 F.2d at 1284–85 (court held that whether third party's reliance on compilation was justifiable was a jury question despite accountant's disclaimer; "[a] disclaimer cannot relieve an accountant from the duty to refrain from knowingly being party to fraud."); *see also Hydra–Mac, Inc. v. Onan Corp.*, 430 N.W.2d 846, 852 (Minn.App.1988) (in dispute involving contract to purchase, it would be a "distortion of law" if a cause of action for fraud could not be asserted despite fact that contract validly disclaimed all warranties), *aff'd in part and rev'd in*

leading. *Id.* An actionable misrepresentation requires proof either that the misrepresenter acted dishonestly or in bad faith, i.e., with fraudulent intent or, alternatively, acted negligently. *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn.1986).

*part on other grounds,* 450 N.W.2d 913 (Minn.1990); *St. Croix Printing Equip., Inc. v. Rockwell Int'l Corp.,* 428 N.W.2d 877, 881 (Minn.App.1988), *review denied* (Minn. Nov. 16, 1988) (law would be "distorted" if, under the U.C.C., an action for fraud could not stand because of warranty disclaimer).

Finally, recognizing that a financial compilation, by its nature, is more limited than a review or an audit, and provides a less expensive accounting method for small businesses to efficiently gather and summarize financial information, we address a public policy concern raised by respondents. They urge that permitting this case to go forward would "require a clear expansion of Minnesota law, unprecedented in any other jurisdiction in the nation and well beyond the facts in *Bonhiver.*" We do not intend for this decision to create such widespread consequences. Instead, the reach of our decision should be quite limited. This case presents unique circumstances that would normally not be present in an arm's-length accountant/client relationship. The presence of those unique circumstances in the context of a claim for intentional misrepresentation precludes, we believe, a rule 12 dismissal. The intentional misrepresentation claim here should be reinstated and Dakota should be permitted to go forward with its burden to prove the allegations set forth in the complaint.

## DECISION

Dakota's claim for negligent misrepresentation was properly dismissed for failure to state a claim. Dakota was a third party relying on unaudited compiled financial statements that contained disclaimers clearly stating that the statements were based on the unaudited representations of the company's management and that the accountants did not express an opinion on them. Dakota, as a matter of law, was not entitled to rely on those statements. Dismissal of Dakota's intentional misrepresentation claim is reversed. The complaint's allegations of respondents' knowledge that the audited company's financial condition was different from the condition represented by management and knowledge that Dakota would rely on those statements to extend loans are sufficient to permit Dakota to proceed in an attempt to provide evidence to prove the truth of those allegations.

**Affirmed in part, reversed in part, and remanded.**