2391

ML–LEE ACQUISITION FUND, L.P., Appellant v.
DELOITTE & TOUCHE, Respondent.
(463 S.E. (2d) 618)

Court of Appeals

144

146

*Wilburn Brewer, Jr., Marcus A. Manos* and *Jennifer J. Aldrich,* of *Nexsen, Pruet, Jacobs & Pollard,* Columbia; and *John D. Hughes,* of *Hutchins, Wheeler & Dittmar,* Boston, MA, *for appellant.*

*Jefferson V. Smith, Jr.,* of *Carter, Smith, Merriam, Rogers & Traxler,* of Greer; *James T. Williams, Jr.* and *S. Leigh Rodenbough, IV,* of *Brooks, Pierce, McLendon, Humphrey & Leonard,* Greensboro, NC, *for respondent.*

Heard April 4, 1995.

Decided Aug. 21, 1995; Reh. Den. Nov. 17, 1995.

HOWELL, Chief Judge:

In this negligent misrepresentation case, ML–Lee Acquisition Fund, L.P. (ML–Lee) appeals the trial court's grant of summary judgment in favor of Deloitte & Touche (Deloitte). We affirm in part, reverse in part, and remand.

## I.

Emb-Tex Corporation (Emb-Tex), formed in 1962, is a textile embroidery facility in Travelers Rest, South Carolina. Emb-Tex was a subsidiary and sole material asset of ETC Corporation (ETC). Until 1979, Emb-Tex was operated as a family-owned business. Between 1979 and 1986, Emb-Tex was the subject of three leveraged buyouts before being purchased in December 1986 by David McKane and Peter Robbins.

Formed in 1987, ML–Lee is a Delaware limited partnership investing in "mezzanine" securities.[1] ML–Lee invests primarily in unrated securities or securities rated by Standard & Poore's Corporation as BB or lower. In May 1988, ML–Lee invested in Emb-Tex through a $16,000,000 loan to a newly formed holding corporation which then purchased the stock of Emb-Tex. At the time of this investment, Emb-Tex had an outstanding debt of more than $23,000,000 secured by liens on Emb-Tex's assets, including $18,000,000 of debt incurred in February 1987.[2] In December 1990, ML–Lee directly invested another $2,000,000 in Emb-Tex. ML–Lee claims it made the investment after relying on the audit reports of Emb-Tex's financial statements produced by Deloitte for the years 1985 through 1988.

Deloitte was an accounting firm. From 1983 to 1988 Deloitte prepared the audited financial statements for Emb-Tex. When Deloitte accepted Emb-Tex as a client in 1983, Deloitte was generally aware that one of the reasons that Emb-Tex wanted audited financial statements was to provide them to outside investors. However, at the time the 1983-1986 reports were prepared, Deloitte was not aware of ML–Lee, which was formed in 1987, nor of any intention by Emb-Tex to deal with ML–Lee.

ML–Lee operates through an investment advisor, Thomas H. Lee Company, Inc. (Lee Advisor), which analyzes and recommends investments to ML–Lee. Sometime before Febru-

---

[1] Mezzanine investments typically involve private placement in private companies, and include significant equity participation and negotiated financial covenants.

[2] The $18,000,000 in loans consisted of a loan from Kleinwort Benson (Kleinwort) in the amount of $11,700,000, and a loan from Security Pacific in the amount of $6,300,000. ML–Lee's financing was intended to replace Kleinwort's subordinated debt.

ary 1988, Lee Advisor was contacted by Kidder, Peabody (Kidder), a New York investment banking firm hired by Emb-Tex about a possible investment in Emb-Tex. Emb-Tex and Kidder produced an offering memorandum dated January 18, 1988. In the offering memorandum, Emb-Tex provided background information on itself while Kidder provided historical financial information for the years 1983-1987, as well as financial projections through 1996. The offering memorandum also included the audited financial statements produced by Deloitte for the years 1983-1986.

Evaluation of the proposed investment was performed by a Lee Advisor "deal team" whose members were Glenn Hutchins, Steven Segal and Warren C. Smith, Jr. Lee Advisor generated computer models that projected Emb-Tex's future growth by incorporating historical financial information. On February 26, 1988, Lee Advisor issued its analysis to ML–Lee and recommended the investment in Emb-Tex. On March 1, 1988, the ML–Lee partners voted favorably on the proposed investment.

On or near March 1, 1988, Lee Advisor hired Peat Marwick to review Emb-Tex's records, including the Deloitte audits. On March 14, 1988, after reviewing the workpapers prepared by Deloitte in connection with its 1987 audit, Peat Marwick recommended further investigation and testing. Peat Marwick's report included the results of inventory valuation samples in which three of twenty-one samples taken by Deloitte resulted in an overstatement of inventory. Peat Marwick also reported the inventory valuation method was unusual, and recommended that further testing be performed.

On March 21, 1988, Lee Advisor, on behalf of ML–Lee, wrote a letter to Kidder offering a commitment to purchase $16,000,000 of subordinated notes in Emb-Tex. The commitment letter, however, expressly conditioned the consummation of the purchase on the fulfillment of several conditions, including a requirement that ML–Lee be satisfied that there had been no material adverse change in the financial condition of ETC and Emb-Tex, and a comfort letter "for the purpose of assuring that the transactions contemplated by [the offer] would not be avoidable under any bankruptcy or fraudulent conveyance law." This offer was accepted by Emb-Tex on March 23, 1988.

On May 23, 1988, Deloitte issued the comfort letter to Emb-Tex and ML–Lee. The letter stated Deloitte had read Emb-Tex's unaudited financial statements for the four months ending April 30, 1988, and had made certain inquiries of Emb-Tex and ETC officials with regard to Emb-Tex's accounting procedures and financial condition. The letter further stated:

> The foregoing procedures do not constitute an examination made in accordance with generally accepted auditing standards, and they would not necessarily reveal matters of significance with respect to the comments in the following paragraph. Accordingly, we make no representations as to the sufficiency of the foregoing procedures for [ML–Lee's] purposes.
> Based upon [these procedures], nothing has come to our attention which causes us to believe that the unaudited financial statements . . . have not been prepared in accordance with generally accepted accounting principles applied on a basis consistent with that of the [1987 audited financial statements] . . . or that there has been, as of May 20, 1988, an increase in long-term debt, a decrease in stockholder's equity or total assets of [Emb-Tex] or a material change in the internal accounting controls of [Emb-Tex] as compared to such amounts or matters for the year ended December 31, 1987.
> . . . [N]othing has come to our attention as a result of the foregoing procedure, however, that causes us to believe that during the period from December 31, 1987 to May 20, 1988, there has been a decrease in stockholder's equity or total assets of ETC Corporation as compared to such amounts for the year ended December 31, 1987.

A new corporation, Emb-Tex Holdings Corporation (Holdings), was formed for the purpose of entering into the purchase agreement with ML–Lee. On May 24, 1988, the transaction was closed. ML–Lee transferred the $16,000,000 to Holdings, and, pursuant to the Note and Warrant Purchase Agreement (Purchase Agreement), ETC (the parent company of Emb-Tex) merged into Holdings. Lee Advisor, Kidder, McKane and Robbins, and legal counsel for Emb-Tex and ML–Lee all received fees in association with the transaction. Deloitte did not receive any payment.

On November 2, 1990, Lee Advisor prepared a memorandum recommending an additional $2,000,000 investment in Emb-Tex by ML–Lee. Lee Advisor used the Deloitte audited financial statements for 1988 and draft financial statements for 1989 in preparing the financial summary that accompanied its recommendation. At the time, Lee Advisor was aware Emb-Tex was not performing as well as initially anticipated. Lee Advisor believed the major problem was the large disbursements made by Emb-Tex to McKane and Robbins in a two-year period. Many of the disbursements were for personal expenses of McKane and Robbins, and were made without the knowledge of Emb-Tex's creditors. Lee Advisor was aware that McKane and Robbins, in violation of their agreement with ML–Lee, set up a partnership to buy assets that were to be leased back to Emb-Tex. Lee Advisor was also aware of numerous problems at Emb-Tex, including Emb-Tex's failure to pay income taxes withheld from payroll, failure to pay pension fund payments, and Emb-Tex's failure to make quarterly interest payments to ML–Lee. Lee Advisor advised ML–Lee to purchase the assets of Holdings instead of stock because it was concerned there would be hidden problems due to the poor management of McKane and Robbins. At the time Lee Advisor recommended the additional investment, ML–Lee had written off $8,000,000 of its original investment in Emb-Tex.

On November 6, 1990, the ML–Lee partners approved the additional $2,000,000 investment. On November 21, 1990, ML–Lee entered into a letter of intent with McKane and Robbins to purchase certain assets of Holdings, including the stock of Emb-Tex, in consideration for ML–Lee's agreement not to demand repayment of the $16,000,000 loan. The letter of intent contained many conditions precedent to the closing of the transaction, including the completion of the "financial and accounting investigation and due diligence" with respect to Holdings and its subsidiaries.

By the Fall of 1990, Deloitte still had not completed its audit of Emb-Tex's financial statements for 1989. In late November 1990, Janice Thomas, the managing auditor on the Emb-Tex account, reviewed the inventory workpapers and realized they needed further work. During this time, Thomas had lunch with Lamar Forsythe, a former Deloitte accountant

then working for Emb-Tex. Forsythe indicated to Thomas that Emb-Tex's inventory may be overvalued. Upon her return to the Deloitte offices after the lunch, Thomas destroyed the inventory workpapers, intending to completely redo the inventory analysis. Thomas reported the action to David Sutton, a Deloitte partner.

Within a week of Thomas' report to Sutton, Sutton participated in a conference call with John Sanders, a former Deloitte employee, and Warren Smith of Lee Advisor. Sutton learned during the phone call that ML–Lee intended to purchase Emb-Tex through an additional $2,000,000 investment. Sutton stated during the call he considered ML–Lee to be their new client with respect to the audit work performed for Emb-Tex. Sutton mentioned Emb-Tex's inventory as problematic while discussing the fees for the audit work, but he did not mention the overvaluation.

On November 29, 1990, Sutton faxed to Mike Lindsey at Deloitte's national office a memo describing ML–Lee's proposed investment in Emb-Tex, and stating that Deloitte has "major problems" to resolve concerning "the integrity of client (former client)"; "inventory values Emb-Tex"; and "reliance on our reports for transfer of interest." The memo suggested Sutton believed one of Deloitte's best options was to withdraw from the engagement. On the December 2, 1990 entry in the daily calendar of the Deloitte accountant who prepared the Emb-Tex inventory workpapers was a note mentioning a $3,500,000 inventory overvaluation. On December 3, 1990, Deloitte withdrew from the auditor-client relationship with Emb-Tex, apparently without explanation.

ML–Lee closed on the $2,000,000 investment on December 11, 1990, and made advances on the investment until March 25, 1991. On December 29, 1990, Peat Marwick performed an inventory count observation on Emb-Tex and discovered no overstatement of inventory. On February 14, 1991, Deloitte's Sutton received a letter from Hal Linn, the former controller of Emb-Tex. In the letter Linn stated that Gene Venesky, the president of Emb-Tex, had overstated the Emb-Tex inventory from December, 1985 through September 1989 by $2,500,000 to $4,000,000. Linn sent a similar letter on February 23, 1991 to Peat Marwick, describing the methods Venesky used to overstate the inventory. Peat Marwick conducted a new in-

ventory in March 1991 and reported a $7,000,000 overstatement. Security Pacific placed Emb-Tex in receivership on April 11, 1991.

ML–Lee then filed this action against Deloitte, alleging professional negligence and negligent misrepresentation. The trial court granted Deloitte's motion for summary judgment, concluding as a matter of law that Deloitte did not owe a duty to ML–Lee, and that ML–Lee did not rely on Deloitte's audit reports.[3]

## II. *Summary Judgment on Novel Issue*

ML–Lee argues that questions of first impression should not be decided without a trial, thus the trial judge erred in granting summary judgment. We disagree. Summary judgment is appropriate if no genuine issues of material fact exist. *Johnston v. Bowen,* 313 S.C. 61, 437 S.E. (2d) 45 (1993). However, summary judgment should not be granted if further inquiry into the facts is desirable to clarify the application of the law.

In support of its argument, ML–Lee relies on *Shea v. Department of Mental Retardation,* 279 S.C. 604, 310 S.E. (2d) 819, (Ct. App. 1983), *overruled on other grounds by McCall v. Batson,* 285 S.C. 243, 329 S.E. (2d) 741 (1985). In *Shea,* this Court held that the trial court improperly granted summary judgment because the construction of a statute and its application to the parties was not clear, stating "[i]f the statute's application is not absolutely clear as a matter of law, [the] question should not be decided without fully developing the facts by means of trial." *Id.* 279 S.C. at 611, 310 S.E. (2d) at 822. Thus, *Shea* does not stand for the proposition that all issues of novel impression require a trial. *Shea* simply represents a particular application of the well-established law of summary judgment, concluding that further inquiry into the facts was warranted.

The trial court reviewed the discovery of the parties consisting of more than 3,000 pages in excerpts from deposition transcripts and documents before granting summary judgment, and the record on appeal consists of more

---

[3] The trial court also granted summary judgment on ML–Lee's professional negligence claim because ML–Lee was not Deloitte's client. ML–Lee does not challenge this ruling on appeal.

than 2,000 pages. We therefore conclude the facts in this case are sufficiently developed to consider Deloitte's summary judgment motion. The mere fact that this case involves a novel issue does not render summary judgment inappropriate. However, the question now before this Court is whether the trial court properly concluded that there were no genuine issues of material facts.

### III. *Negligent Misrepresentation*

To state a claim for negligent misrepresentation, the plaintiff must allege that (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation. *Fields v. Melrose Ltd. Partnership*, 312 S.C. 102, 439 S.E. (2d) 283 (Ct. App. 1993). Because the trial court decided the case in Deloitte's favor on the issues of duty and reliance only, we likewise address only those elements of ML–Lee's negligent misrepresentation claim.

### A. The Duty of Public Accountants to Third Parties

The scope of a public accountant's duty to third persons who use and rely on their reports is an issue of first impression in South Carolina. However, in the states considering the issue, three main approaches have developed. The most restrictive approach, requiring strict contractual privity before liability could be imposed, was first enunciated by Chief Judge Cardozo of the New York Court of Appeals in *Ultramares Corp. v. Touche, Nivin & Co.*, 255 N.Y. 170, 174 N.E. 441, 446 (1931). The *Ultramares* strict privity standard was relaxed somewhat by the court in *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y. (2d) 536, 493 N.Y.S. (2d) 435, 483 N.E. (2d) 110 (N.Y. 1985) to extend recovery to third parties enjoying a relationship to the accountant that "sufficiently approaches privity." Thus, under New York's "near privity" approach, accountants may be liable to third parties only if (1) the accountants actually know their reports will be used for a particular purpose; (2) the accountants know that a nonclient is expected

to rely on the reports in furtherance of a particular purpose; and (3) there has been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountant's understanding of that party's or parties' reliance. *Id.* Several states follow New York's "near privity" approach. *See, e.g., Colonial Bank of Alabama v. Ridley & Schweigert,* 551 So. (2d) 390 (Ala. 1989); *Idaho Bank & Trust Co. v. First Bancorp of Idaho,* 115 Idaho 1082, 772 P. (2d) 720 (1989); *Thayer v. Hicks,* 243 Mont. 138, 793 P. (2d) 784 (1990) (adopting modified version of near-privity approach).

The second approach, which ML–Lee wishes this Court to adopt, is the foreseeability approach, which extends an accountant's liability to all persons who the accountant should reasonably foresee might obtain and rely on the accountant's work. This approach, which subjects accountants to liability on the same basis as other tortfeasors, has been adopted in few jurisdictions. *See, e.g., Touche, Ross & Co. v. Commercial Union Ins. Co.,* 514 So. (2d) 315 (Miss. 1987); *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A. (2d) 138 (1983).[4]

The majority view, adopted recently in Georgia and North Carolina,[5] is set forth in the *Restatement (Second) of Torts,* § 552 (1977), which provides, in pertinent part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

---

[4] However, since *H. Rosenblum,* New Jersey has statutorily limited the duty of accountants to third parties. *See Patrillo v. Bachenberg,* 139 N.J. 472, 655 A. (2d) 1354 (1995) (discussing New Jersey Senate Bill No. 826).

[5] See *Badische Corp. v. Caylor,* 257 Ga. 131, 356 S.E. (2d) 198 (1987), and *Raritan River Steel v. Cherry, Bekaert & Holland,* 322 N.C. 200, 367 S.E. (2d) 609 (1988).

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Thus, under the *Restatement,* an accountant's duty is limited to the client and third parties whom the accountant or client intends the information to benefit. The *Restatement* approach recognizes that an accountant's duty should extend beyond those in privity or near-privity with the accountant, but is not so expansive as to impose liability where the accountant knows only of the possibility of distribution to anyone, and their subsequent reliance. *Raritan River Steel v. Cherry, Bekaert & Holland,* 322 N.C. 200, 367 S.E. (2d) 609, 617 (1988).

Determining the scope of a public accountant's duty to third parties requires a consideration and balancing of competing public policy concerns. A primary function of public accountants is to perform audits for their clients.[6] When performing an audit, the accountant reviews the client-prepared statements and issues an opinion regarding whether the statements fairly represent the financial condition of the client company. For practical reasons, an audit rarely examines every transaction of a business. Instead, the accountant evaluates the internal controls of a business, and tests their efficacy with sample transactions. The end product of an audit is an audit report generally written to the client. The audit report may be used by the company to satisfy federal securities requirements (if the company's stock is publicly traded), or to satisfy the requirements of potential lenders. An audit, therefore, may be relied upon by the company, commercial lenders, and members of the investing public. Thus, accountants to some extent perform a public watchdog function, and therefore should provide the public with accurate information. An expansive view of the scope of an accountant's duty is consistent with the expansive uses to which the accountant's work product is put, and would encourage accountants to take extreme care before issuing an audit. In fact, some states adopting the foreseeability approach compare defective audits with

[6] The following description of the auditing function is summarized from the discussions in *Bily v. Arthur Young & Co.,* 3 Cal. (4th) 370, 11 Cal. Rptr. (2d) 51, 834 P. (2d) 745 (1992), and *First National Bank of Commerce v. Monco Agency, Inc.,* 911 F. (2d) 1053 (5th Cir. 1990).

defective products, refusing to insulate accountants with a privity requirement when no such requirement is imposed on manufacturers of defective products. *See H. Rosenblum,* 461 A. (2d) at 147. However, accountants typically have little control over the ultimate dissemination of their work. To hold them liable to any person who eventually relies on their work could "expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares,* 255 N.Y. at 179, 174 N.E. at 444.

In explicitly rejecting the foreseeability approach, the North Carolina Supreme Court recognized the competing public policy concerns, but concluded that the foreseeability approach would result in liability more expansive than an accountant should be required to bear. *Raritan,* 367 S.E. (2d) at 615-616. the court observed:

> Between the production and distribution of an accountant's audit and report and the design and manufacture of a product we perceive significant differences which justify establishing a narrower class of plaintiffs to whom the accountant owes a duty of care. Designers and manufacturers have control over the processes by which the products enter the stream of commerce. Manufacturers . . . can limit their potential liability by controlling the number of products they release into the marketplace. Auditors, on the other hand, have no control over the distribution of their reports, and hence lack control over their exposure to liability. Moreover, . . . auditors do not control their client's accounting records and processes. . . . Because of the accountant's inability to control the distribution of his report, as well as his lack of control over some of the contents of the statements he assesses, a standard which limits his potential liability is appropriate.
>
> A more fundamental difference between product designers and manufacturers and accountants lies in their differing expectations concerning their work product. Manufacturers and designers fully expect that their products will be used by a wide variety of unknown members of the public. Indeed, this is their hope. . . . This is not the case when an accountant prepares an audit. An accountant performs an audit pursuant to a contract with an in-

dividual client. The client may or may not intend to use the report for other than internal purposes. It does not benefit the accountant if his client distributes the audit opinion to others. Instead, it merely exposes his work to many whom he may have had no idea would scrutinize his efforts. We believe that in fairness accountants should not be liable in circumstances where they are unaware of the use to which their opinions will be put. Instead, their liability should be commensurate with those persons or classes of persons whom they know will rely on their work. With such knowledge the auditor can, through purchase of liability insurance, setting fees, and adopting other protective measures appropriate to the risk, prepare accordingly.

*Id.* at 616 (citations omitted).

The *Restatement* approach is supported by the decision of our Supreme Court in *South Carolina State Port Authority v. Booz-Allen & Hamilton*, 289 S.C. 373, 246 S.E. (2d) 324 (1986). In *Booz-Allen*, the Court allowed the Port Authority to proceed on a negligent misrepresentation theory against Booz-Allen for misrepresentations made about the Port in a report prepared by Booz-Allen for the Georgia Port Authority. The Court found Booz-Allen owed a duty if it knew or should have known the report was intended to be used by the Georgia Port Authority in a certain way. However, the Court specifically held that foreseeability alone does not give rise to a duty and that Booz-Allen had no duty to those distantly affected by their work. *Id.* at 376-77, 346 S.E. (2d) at 325-26.

Moreover, this Court has relied on section 552 of the *Restatement* in other negligent misrepresentation cases. *See, e.g., First Federal Savings Bank v. Knauss*, 296 S.C. 136, 370 S.E. (2d) 906 (Ct. App. 1988); *Winburn v. Insurance Co. of North America*, 287 S.C. 435, 339 S.E. (2d) 142 (Ct. App. 1985). Accordingly, we conclude the *Restatement* approach represents the soundest method of determining the scope of an accountant's duty to third persons for negligent misrepresentation. As did the North Carolina Supreme Court, we conclude that the *Restatement* approach balances "the need to hold accountants to a standard that accounts for their contemporary role in the financial world with the need to protect

them from liability that unreasonably exceeds the bounds of their real undertaking." *Raritan*, 367 S.E. (2d) at 617.

However, a determination that the trial court properly adopted the *Restatement* approach does not end our inquiry. The more difficult question is whether the trial court properly concluded that, under the *Restatement*, Deloitte was entitled to summary judgment.

### (1) $16,000,000 Investment

ML–Lee contends it examined and relied on several audit reports prepared by Deloitte before making its initial investment in Emb-Tex and Holdings. We will examine these reports separately to determine whether Deloitte owed ML–Lee a duty in connection with the reports.

### (a) 1985 and 1986 Audit Reports[7]

As to the 1985 and 1986 audit reports, we agree with the trial court that Deloitte owed no duty to ML–Lee.

Under the *Restatement*, an accountant's duty is limited to the client and third parties whom the accountant or client intends the information to benefit. *Restatement* § 552 (1977); *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 11 Cal. Rptr. (2d) 51, 834 P. (2d) 745 (1992). If the intent is that of the client rather than the accountant, the accountant must have actual knowledge at the time he prepares the audit that the client intends to provide the information to a third party. *Raritan*, 367 S.E. (2d) at 614. While there is no requirement that the accountant know the precise identity of the third party, the accountant must have actual knowledge that the information will be supplied to a limited group of persons for the purpose of influencing those persons. *See Badische Corp. v. Caylor*, 257 Ga. 131, 356 S.E. (2d) 198, 200 (1987) (accountant liable to "those persons, or the limited class of persons who the professional is actually aware will rely upon the information he prepared."); *First Nat'l Bank of Commerce v. Monco Agency,*

---

[7] Deloitte's audit opinion dated February 27, 1986 covered the financial statements for Emb-Tex for the years ended December 31, 1985 and 1984. We will refer to the audit opinion as the 1985 opinion or 1985 report, and to the financial statements as the 1985 financial statements. Deloitte's opinion dated March 3, 1987 covered the financial statements for Emb-Tex for the years ended December 31, 1986 and 1985. We will refer to these documents as the 1986 report or opinion and the 1986 financial statements.

*Inc.*, 911 F. (2d) 1053, 1059 (5th Cir. 1990) (Under the restatement, an accountant's "liability is fixed by the accountant's particular knowledge at the moment the audit is published."); *Restatement* § 552, comment h ("it is enough that the maker of the representation intends to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons, or group."). In our view, to require anything less than actual knowledge of the client's intent to use the information to influence particular third parties would eliminate much of the difference between the *Restatement* approach and the foreseeability approach.

Deloitte issued the 1985 audit report in the spring of 1986, and the 1986 audit report in the spring of 1987. ML–Lee was not formed until the latter part of 1987 and did not begin negotiations for its investment until the spring of 1988. It is therefore clear that neither Deloitte nor Emb-Tex intended ML–Lee to benefit by the reports. At the time Deloitte developed the reports for 1983 through 1986, it was unaware of any possible use of the reports by ML–Lee; thus Deloitte owed ML–Lee no duty in connection with the 1985 and 1986 audit reports. *See Monco*, 911 F. (2d) at 1059 (Under the restatement, an accountant's "liability is fixed by the accountant's particular knowledge at the moment the audit is published."); *Raritan*, 367 S.E. (2d) at 618 (liability attaches if accountant knows at the time he prepares the information that the client intends to supply the information to a third party).

Section 552 of the *Restatement* provides that an accountant's duty is limited to intended recipients of the accountant's work who rely on the work "in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." *Restatement* § 552(2)(b). Relying on this subsection ML–Lee contends it should be able to step into the shoes of Kleinwort, a prior creditor of Emb-Tex, when determining whether Deloitte owed ML–Lee a duty. According to ML–Lee, its investment in Emb-Tex is substantially similar to

the loan made by Kleinwort to Emb-Tex. Because Deloitte knew Kleinwort would rely on its 1985 and 1986 audit opinions,[8] and because the proceeds of ML–Lee's investment in Emb-Tex were used to satisfy the debt owed to Kleinwort, ML–Lee essentially argues it is the beneficiary of the duty owed by Deloitte to Kleinwort. We disagree.

■ ML–Lee's argument fundamentally misconstrues the "substantially similar" provision of the *Restatement*.

The *Restatement* imposes liability on an accountant only if the accountant knows his work will be furnished to a third party, *and* that party relies on the accountant's work in connection with the expected transaction or a substantially similar transaction. *Restatement* § 552(2). Thus, the substantially similar provision merely broadens the reliance requirement by imposing liability on the accountant if a known third party relies on the accountant's work in a transaction different from that originally contemplated by the accountant or his client, provided the transaction is substantially similar to the transaction first contemplated. The "substantially similar" provision does not, as ML–Lee contends, expand the knowledge requirement to impose liability where the accountant's work is furnished to unknown third parties in a transaction substantially similar to the originally contemplated transaction.

■ Moreover, even if ML–Lee's interpretation were correct, we agree with the trial court that ML–Lee's investment is not substantially similar to Kleinwort's loan. Kleinwort made a secured, term loan to Emb-Tex, the principal of which was to be repaid in equal semiannual payments. ML–Lee's investment was unsecured and more in the nature of an equity investment. ML–Lee was to be repaid in one lump sum at the end of ten years. While the *Restatement* does not define "substantially similar," it does state that "[t]he ordinary practices and attitudes of the business world are to be taken into account, and the question becomes one of whether the departure from the contemplated transaction is so major and so significant that it cannot be regarded as essentially the same transaction." *Restatement* § 552, comment j. We do not view an investment which was expected to be re-

---

[8] Kleinwort's financing agreement with Emb-Tex required that annual audited financial statements be provided to Kleinwort. Deloitte apparently maintained a copy of the Kleinwort financing agreement in its files.

couped primarily through the sale of stock to be essentially the same transaction as a traditional secured loan which was made over a year before the investment. The trial court therefore properly refused to allow ML–Lee to piggyback its claim onto any duty owed by Deloitte to Kleinwort. Accordingly, we affirm that portion of the trial court's order concluding that Deloitte owed no duty to ML–Lee in connection with the 1985 and 1986 audit reports.

### (b) 1987 Audit Report[9]

The trial court also concluded Deloitte did not owe ML–Lee a duty of care in connection with Deloitte's audit report of Emb-Tex's 1987 financial statements. In reaching this conclusion, the trial court considered it important that ML–Lee's investment was in Holdings, not Emb-Tex, and that Deloitte never issued an audit report on the financial statements of Holdings. However, the court's conclusion was driven primarily by the fact that "ML–Lee had made its decision to invest in Holdings in a meeting of its General Partners on March 1, 1988. At that time, Deloitte had issued no audit report on the 1987 financial statements of Emb-Tex and indeed had not even completed its field work with respect to that audit." The trial court therefore concluded as a matter of law that Deloitte owed no duty to ML–Lee in connection with the 1987 audit report.

ML–Lee contends that Deloitte knew Emb-Tex was seeking to refinance the Kleinwort debt approximately two months before Deloitte issued the 1987 audit report. According to ML–Lee, because Deloitte knew ML–Lee would be relying on the 1987 audit report, Deloitte at least owed ML–Lee a duty with regard to the 1987 report. We agree.

On February 29, 1988, Emb-Tex notified Deloitte that it was negotiating to replace and restructure the Kleinwort debt. While Deloitte's 1987 audit report was dated March 2, 1988,[10] Deloitte did not issue the report until April 22, 1988.

---

[9] Deloitte's audit opinion dated March 2, 1988, covered the financial statements for Emb-Tex for the years ended December 31, 1987 and 1986. Again we will refer to the documents as the 1987 report or opinion and the 1987 financial statements.

[10] Under generally accepted auditing standards, an auditor's opinion is dated as of the date of the completion of field work.

Thus, when Deloitte issued the 1987 report, it had actual knowledge that a refinancing was intended, although it did not know the specific identity of the intended creditor. On April 22, 1988, Deloitte sent ML–Lee a copy of the 1987 audit report and Emb-Tex's 1987 financial statements. These facts clearly bring ML–Lee within the scope of the duty imposed on Deloitte by the *Restatement*. While the fact that ML–Lee's general partners preliminarily approved the investment before Deloitte issued the 1987 report may be relevant when considering whether ML–Lee relied on the report, it has no bearing on the conclusion that Deloitte owed a duty to ML–Lee.

Likewise, the fact that ML–Lee technically invested in Holdings rather that Emb-Tex is irrelevant to the duty issue. At the time it issued its 1987 audit report, Deloitte knew that Emb-Tex was seeking to refinance its Kleinwort debt through Emb-Tex. Moreover, the comfort letter issued by Deloitte to ML–Lee acknowledged that ML–Lee was investigating the affairs of Emb-Tex and ETC, and the letter specifically mentioned a "financing agreement." At the very least, Deloitte's knowledge of the transaction gives rise to an inference that Deloitte knew at the time it issued its 1987 report that the report would be used by Emb-Tex in negotiating the refinancing. That the transaction ultimately was structured to provide for an investment Holdings rather than directly in Emb-Tex does not negate Deloitte's knowledge, and thus has no bearing on the question of the duty owed by Deloitte to ML–Lee. Accordingly, we conclude the trial court erred when it concluded Deloitte did not owe ML–Lee a duty in connection with the 1987 audit report.

### (c) Comfort Letter

ML–Lee also contends Deloitte owed it a duty in connection with the comfort letter issued by Deloitte to ML–Lee on May 23, 1988. As noted above, the comfort letter provided that, subject to certain disclaimers about the scope of Deloitte's inquiry and the methods used by Deloitte, Deloitte had no reason to believe that Emb-Tex's unaudited financial statements for the first four months of 1988 had not been prepared in accordance with generally accepted accounting principles, and that Deloitte had no reason to believe there had been any increase in Emb-Tex's long-term debt, or de-

crease in the stockholders' equity in or total assets of Emb-Tex, as compared to that revealed in the audited 1987 financial statements. The comfort letter was addressed by Deloitte specifically to ML–Lee. Thus, it was clear that under the *Restatement*, Deloitte owed ML–Lee a duty to ensure that the comfort letter itself was free from negligent or intentional misrepresentations. Considering the disclaimers and the limited assurances given in the letter, we question whether the comfort letter in fact contains any misrepresentations.[11] Nonetheless, the trial court did not address this question, and we believe the question should be resolved by the jury on remand. *See State Farm Auto. Ins. Co. v. Pennsylvania Nat'l Mut. Casualty Ins. Co.*, 263 S.C. 391, 210 S.E. (2d) 613 (1974) (whether or not there has been a misrepresentation is an ultimate issue of fact for the jury).

### (2) $2,000,000 Investment

ML–Lee also contends Deloitte had a legal obligation to inform ML–Lee when Deloitte learned of Emb-Tex's inventory overvaluation. According to ML–Lee, it would not have made the additional $2,000,000 investment in Emb-Tex if Deloitte had informed it of the overvaluation. Nondisclosure of a fact may be fraudulent if the if the party withholding the information has a duty to speak. *Ardis v. Cox*, 314 S.C. 512, 431 S.E. (2d) 267 (Ct. App. 1993), *cert. denied* (April 8, 1994). Under the particular circumstances of this case, we agree with ML–Lee that Deloitte had a duty to inform ML–Lee of the inventory overvaluation.

As discussed previously, within a week after Thomas' report to Sutton, Sutton participated in a conference call with John Sanders, a former Deloitte employee, and Warren Smith of Lee Advisor. While the date of this phone call is not certain, it appears the phone call took place before McKane and Robbins signed the letter of intent on November 21.[12] Without the knowledge of the other parties, Sut-

---

[11] Moreover, given our conclusion that Deloitte owed ML–Lee a duty in connection with the 1987 audit report, we fail to see how any misrepresentation in the comfort letter could expose Deloitte to liability different from any liability arising from the 1987 audit report. In fact, ML–Lee's own expert testified that the comfort letter was incorrect because the 1987 financial statements were incorrect.

[12] During the phone conversation, Smith told Sutton that, as drafted, the letter of intent required the cooperation of McKane and Robbins in providing

ton recorded the conversation. During the phone call, Smith informed Sutton of the proposed transaction. Smith made it perfectly clear to Sutton that the financial statements were crucial to the transaction, and questioned whether the audits or a comfort letter could be completed by the week of December 17, the target date for the closing of the transaction. The conversation was very detailed, with Sutton asking many questions about how the transaction would be structured. At one point Sutton stated "I would presume that we would view ML–Lee as basically our client now from the standpoint of the completion of this audit work?" Sutton also questioned Smith about who would sign the client representation letter for the incomplete 1989 audit.[13] Sutton mentioned the inventory as problematic while discussing the fees for the audit work, but he did not mention the overvaluation.

By early December 1990, Deloitte knew that there was a potential inventory overvaluation of as much as $3,500,000. Whether or not this information was sufficient for Deloitte to question the accuracy of its previously issued audit reports, because of the circumstances of Deloitte's particularized knowledge of the contemplated transaction and Deloitte's own belief that ML–Lee was, in effect, its client, we conclude that Deloitte had a duty to disclose to ML–Lee its knowledge of the potential inventory overvaluation. *Ardis*, 314 S.C. at 514, 432 S.E. (2d) at 269 (duty to disclose may arise where one party expressly reposes a trust and confidence in the other with reference to the particular transaction in question, or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied). Accordingly, we find the trial court erred in determining that Deloitte did not have a duty to disclose to ML–Lee its knowledge of the inventory overvaluation.

---

access to records necessary to complete the 1989 and 1990 audits. After learning that Deloitte had never issued an audit for Holdings, Smith stated he would include the 1988 audit in the letter. The letter of intent signed by McKane and Robbins dated November 21, 1990 included the requirements regarding the 1988 audit.

[13] A client representation letter is addressed to the accountant from the client, and attests to the truth of the information provided to the accountant by the client in connection with an audit.

Moreover, while there is no specific evidence in the record, the evidence is sufficient to give rise to an inference that Deloitte knew its previously issued reports were incorrect. If the jury concludes that Deloitte knew its previous reports were inaccurate or misleading, then, under the particular circumstances of this case, Deloitte also had a duty to withdraw those opinions or reveal the inaccuracies to ML–Lee. *See Chevron Chem. Co. v. Deloitte & Touche,* 168 Wis. (2d) 323, 483 N.W. (2d) 314 (1992) (accounting company guilty of negligent misrepresentation when it failed to notify parties known to be relying on its financial statements of an error in the statements); *Rudolph v. Arthur Anderson & Co.,* 800 F. (2d) 1040, 1044 (11th Cir. 1986), Cert. denied, 480 U.S. 946, 107 S.Ct. 1604, 94 L.Ed. (2d) 790 (1987) (accountant has a duty to disclose ordinary business information if it shows a previous report to have been misleading or incorrect when issued); *ITT, An Internat'l Invest. Trust v. Cornfeld,* 619 F. (2d) 909, 927 (2d Cir. 1980) (accountants have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying).

Under the standards promulgated by the American Institute of Certified Public Accountants, an auditor must issue a correction to each person known to him to be relying on inaccurate financial statements if the client refuses to make the disclosure. American Institute of Certified Public Accountants, Statement on Auditing procedure No. 1, AU § 561 (1972) (*quoted in Chevron,* 483, N. W. (2d) at 319-20.) Thus, the duty we impose on Deloitte here is consistent with the standards to which auditors are held by members of their own profession.

## B. Reliance

The trial court also granted summary judgment in favor of Deloitte on the ground that ML–Lee did not rely on Deloitte's audit reports. Under ML–Lee's investment policies, because the Emb-Tex investment did not meet certain established guidelines, it required the recommendation of the managing general partner and the approval of the independent general partners. The president of the managing partner and the independent general partners testified that they neither reviewed not discussed Deloitte's audit reports on the Emb-Tex finan-

cial statements. The trial court properly held that the reliance element could not be satisfied through the conduct of these parties. However, the trial court also rejected ML–Lee's argument that reliance on the Deloitte reports by Lee Advisor could be imputed to ML–Lee, thus satisfying the reliance requirement. The trial court further held that, even if the reliance of Lee Advisor was sufficient, it did not rely on Deloitte's audit reports. We conclude that there are genuine issues of material fact with regard to reliance by ML–Lee on Deloitte's audit reports, and that the trial court therefore erred in granting summary judgment to Deloitte.

### (1) Reliance by Agent

ML–Lee first argues the trial court erred in holding that reliance by Lee Advisor was insufficient to satisfy the reliance element of ML–Lee's negligent misrepresentation claim. We agree.

The trial court determined that, even if Lee Advisor were ML–Lee's agent, Lee Advisor's reliance could not be imputed to ML–Lee. Quoting *Learjet Corp. v. Spenlinhauer*, 901 F. (2d) 198 (1st Cir. 1990), the trial court stated " 'because courts generally restrict negligent misrepresentation claims to a narrower class of plaintiffs than fraudulent misrepresentation claims,' indirect reliance is permitted in the case of fraudulent misrepresentation but not in the case of negligent misrepresentation." The court therefore concluded that

> the rule in South Carolina should be that the decision-makers for a third party, in this case the Independent General Partners of ML–Lee, must actually review the audited financial statements themselves in order to later claim reliance thereon in asserting a claim for negligent misrepresentation. Otherwise, an auditor would be faced with the prospect of having to defend watered down, misrepresented or partially disseminated information gleaned and digested by others from his audit report.

We believe the rule fashioned by the trial court is too restrictive, and completely unworkable in a corporate setting. "Where a fraud is considered as worked upon an agent by a third person, either by misrepresentation or by silence, the fraud is considered as worked upon the principal, and the latter has a right of action against the third person." 3

Am. Jur. (2d) *Agency* § 298 (1986); *accord Rowan County Bd. of Educ. v. United States Gypsum Co.*, 103 N.C. App. 288, 407 S.E. (2d) 860 (1991), *aff'd* 332 N.C. 1, 418 S.E. (2d) 648 (1992); *Restatement (Second) of Torts* § 315. While generally stated in the context of fraud claims, we find this principle to be equally applicable to claims of negligent misrepresentation. The authorized acts of an agent are the acts of the principal. *Crim v. E.F. Hutton, Inc.*, 298 S.C. 448, 381 S.E. (2d) 492 (1989); *Carver v. Morrow*, 213 S.C. 199, 48 S.E. (2d) 814 (1948). Thus, the reliance on a representation by an agent amounts to the reliance by the principal. The trial court's requirement that the "decision makers" actually review and rely on a statement in order to prevail in a negligent misrepresentation claim simply ignores the fact that corporations and other business entities must function through their agents and employees in order to operate efficiently. To require company presidents or members of the board of directors to review individually every document important in every transaction would bring the operations of business to a standstill. Accordingly, we conclude that reliance by an agent amounts to reliance by the principal in cases of both fraudulent and negligent misrepresentation. *See Alten v. Atlantic Financial Federal*, 805 F. Supp. 5 (E.D. Pa. 1992) (reliance by plaintiff's accountants satisfied the reliance element of the *Restatement* § 552 in plaintiff's action against accounting firm preparing financial statement, thus precluding summary judgment.).

Moreover, *Learjet*, the case relied upon by the trial court in fashioning its restrictive reliance standard, provides no support for the court's ruling. In *Learjet*, Spenlinhauer bought from Learjet a type of jet for which the Federal Aviation Administration (FAA) had issued, in reliance on certain representations made by Learjet, a certificate of airworthiness. Spenlinhauer brought against Learjet claims of fraudulent and negligent misrepresentation. Spenlinhauer contended he bought the jet in reliance on the FAA's certificate of airworthiness, that the FAA issued the certificate in reliance on Learjet's representations, and that, therefore, he indirectly relied on Learjet's representations when purchasing the jet. *Learjet*, 901 F. (2d) at 199-200. Applying Kansas law, the First Circuit held that while Spenlinhauer could maintain his fraudulent misrepresentation claim, Spenlinhauer's indirect re-

liance was insufficient to support the negligent misrepresentation claim. *Id.* at 202-03.

In *Learjet*, the FAA was not acting as Spenlinhauer's agent when the FAA relied on the representations made by Learjet. Thus, Spenlinhauer's claim for negligent misrepresentation failed because neither Spenlinhauer nor an agent of Spenlinhauer relied on the misrepresentations. Here, there is no dispute that, at least as of March 1, 1988, Lee Advisor was the agent of ML–Lee. Thus, reliance by Lee Advisor after that date amounts to reliance by ML–Lee.

### (2) Actual Reliance

Because we have concluded that reliance by ML–Lee's agent is sufficient for ML–Lee to maintain its negligent misrepresentation claim, we must now determine whether there are genuine issues of fact as to whether Lee Advisor in fact relied on Deloitte's audit report.

### (a) 1985 and 1986 Audit Reports

In section III(A)(1)(a), *Supra*, we concluded that Deloitte did not owe ML–Lee a duty in connection with the 1985 and 1986 audit reports. We therefore need not consider whether there is evidence showing that Lee Advisor relied on these reports. Even if reliance were established, Deloitte is not liable to ML–Lee, because it owed no duty to ML–Lee.[14]

### (b) 1987 Audit Report

As to the 1987 audit report and financial statements, we agree with ML–Lee that there is at least a genuine issue of fact with regard to Lee Advisor's reliance on the documents, and that the trial court therefore improperly granted summary judgment to Deloitte.

In concluding that Lee Advisor did not rely on the 1987 audit report, the trial court stated that

[s]ince that audit report was not issued until April 22, 1988, it could not possibly have been reviewed or relied on by representatives of [Lee Advisor] in formulating

---

[14] For this same reason, we do not consider ML–Lee's argument that Lee Advisor was its agent before March 1, 1988. ML–Lee concedes that Lee Advisor's agency status is relevant only to the question of reliance on the 1985 and 1986 audit reports and financial statements. Without regard to Lee Advisor's agency status, Deloitte is not liable to ML–Lee for any misrepresentations in the 1985 and 1986 financial documents because it owed no duty to ML–Lee.

their recommendation to the General Partners of ML–Lee to invest in Holdings, which recommendation was acted on by the General Partners of ML–Lee at their meeting on March 1, 1988.

While ML–Lee did preliminarily approve the Emb-Tex investment on March 1, 1988, ML–Lee's offer of the investment to Emb-Tex was expressly conditioned on the fulfillment of several conditions, including a requirement that ML–Lee be satisfied that there had been no material adverse change in the financial condition of ETC and Emb-Tex. Likewise, the Purchase Agreement required ML–Lee's preview of audited financial statements of Emb-Tex.[15] Thus, while ML–Lee ap-

---

[15] Deloitte contends the purchase agreement does not require the financial statements of Emb-Tex. The parties to the Purchase Agreement were ML–Lee and Emb-Tex Holdings Corporation, which is referred to in the Agreement as the "Company." As mentioned previously, Emb-Tex Holdings Company was a new corporation formed for the purpose of entering into the transction with ML–Lee. Under the purchase agreement, ML–Lee was to purchase $16,000,000 worth of subordinated notes issued by Emb-Tex Holdings Company. Immediately after the purchase and the consummation of certain other related transactions, ETC Corporation (the parent company of Emb-Tex) was to merge into Emb-Tex Holdings Company, which would be the surviving entity. Thus, Emb-Tex Holdings Company technically had no interest in or control over Emb-Tex until after ML–Lee purchased the subordinated notes.

The Purchase Agreement conditioned ML–Lee's obligation to purchase the subordinated notes on the satisfaction of numerous conditions, including a comfort letter from Deloitte "with reference to the financial statements of the Company," and the furnishing of "certain audited and unaudited financial statements of the Company and its Subsidiaries . . . for the fiscal years ending December 31, 1983, 1984, 1985, 1986 and 1987." Deloitte contends that because "the Company" refers to Emb-Tex Holdings Company, the Purchase Agreement does not require the audited financial statements of Emb-Tex, because Emb-Tex was not a subsidiary of "the Company" until after ML–Lee purchased the notes. We Disagree. To read the Purchase Agreement as requiring audited financial statements of Emb-Tex Holdings Company for years during which it did not exist and for its nonexistent subsidiaries is ludicrous. While the Purchase Agreement does provide that the merger was to occur after ML–Lee's investment, it also provided that "all conditions precedent to the effectuation of the merger of ETC with and into the Company shall have been completed contemporaneously with the funding by the Purchaser of the purchase price for the Notes." Moreover, it is clear from a reading of the Purchase Agreement in its entirety that the term "subsidiaries" included Emb-Tex. Accordingly, the only reasonable construction of the Purchase Agreement yields the conclusion that closing was conditioned upon, *inter alia*, the receipt by ML–Lee of audited financial statements of Emb-Tex and a comfort letter from Deloitte in connection with the financial statements of ETC and Emb-Tex.

proved the investment on March 1, 1988, it had no obligation to make the investment until the transaction closed on May 24, 1988. While ML–Lee or Lee Advisor could not have relied on the 1987 audit report in making their *initial* evaluations of the investment, the 1987 audit report could have been relied upon when determining whether to proceed with the transaction, given that it was issued approximately one month before the transaction closed.

Steven Segal, a member of Lee Advisor's "deal team," testified in his deposition that he waited for the 1987 audited financial statements and that he discussed with several people that the statements must be received prior to closing. Likewise, Glenn Hutchins, another member of the team, also testified that, prior to closing, he received the 1987 financial statements and that he specifically reviewed the 1987 audit report to verify that it was unqualified. This testimony alone is sufficient to create a question of fact for the jury as to whether ML–Lee, through Lee Advisor, actually relied on Deloitte's 1987 audit opinion and financial statements.

Because the projections for future growth of Emb-Tex's earnings included by Lee Advisor in its initial report to ML–Lee used figures that appeared in Kidder's financial statements of Emb-Tex for the years 1983 through 1986, and were different from the figures shown in Deloitte's statements for those years, the trial court stated it was "apparent" that Lee Advisor in fact did not rely on Deloitte's work, but rather on the work of Kidder. Even if this fact were relevant to a consideration of Lee Advisor's reliance on Deloitte's 1987 audit report and financial statements, when the testimony of Segal and Hutchins is considered, it is clear that the trial court determined there was no genuine issue of fact by improperly resolving a conflict in the evidence. *See L & W Wholesale, Inc. v. Gore*, 305 S.C. 250, 407 S.E. (2d) 658 (Ct. App. 1991) (at the summary judgment stage of litigation, the trial court does not weigh conflicting evidence with respect to a disputed material fact). We therefore conclude the trial court erred in determining as a matter of law that ML–Lee did not rely on Deloitte's statements. *See Unlimited Servs., Inc. v. Macklen Enters., Inc.*, 303 S.C. 384, 387, 401 S.E. (2d) 153, 155 (1991) (issues of reliance and its reasonableness are preeminently factual issues for the trier of fact).

### (c) Comfort Letter

The trial court held ML–Lee did not rely on the comfort letter, again hinging its decision on the initial approval by ML–Lee of the Emb-Tex investment on March 1, 1988. As discussed above, ML–Lee's tentative approval of the investment does not compel the conclusion that ML–Lee did not rely on any documents generated after that date. The letter of intent made receipt of a satisfactory comfort letter a condition of closing, as did the Purchase Agreement. Thus, ML–Lee could have abandoned the transaction had it not received the comfort letter. Moreover, ML–Lee's Segal testified about what he was looking for in the comfort letter, and that he waited to receive the comfort letter. This evidence is sufficient to create genuine issues of fact with regard to ML–Lee's reliance on the comfort letter.

The trial court also concluded that if ML–Lee relied on the comfort letter, any such reliance was unreasonable as a matter of law. The comfort letter contained fairly limited assurances about the Emb-Tex's financial condition. In addition, the comfort letter included a disclaimer stating that Deloitte "make[s] no representations as to the sufficiency of the foregoing procedures for [ML–Lee's] purposes." The limited scope of the letter and the inclusion of a disclaimer, however, do not require a finding that any reliance on the letter was not justified as a matter of law. *See Robert E. Lee & Co. v. Commission of Pub. Works,* 248 S.C 84, 149 S.E. (2d) 55 (1966) (in a case where construction plans did not fully disclose the information contained in the logs of the test borings, and a disclaimer included in the plans stated no express or implied guarantee was made as to the accuracy or interpretation of the information given in the plans and recommended further investigations, the court held that the contractor was entitled to rely upon representations in the plans, and that the owner's responsibility was not overcome by the disclaimer clauses).

Under the *Restatement,* reliance is measured in terms of negligence; that is, if the plaintiff was negligent in relying on the representation, he is barred from recovery. *Restatement* § 552A ("The recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying."). Thus, like questions of contributory negligence, we conclude

whether ML–Lee's reliance on the comfort letter was justifiable, given the disclaimers included in the letter, is a question that should be resolved by the jury. *See Wallace v. Owens-Illinois, Inc.*, 300 S.C. 518, 389 S.E. (2d) 155 (Ct. App. 1989) (question of contributory negligence is ordinarily a question of fact for the jury; if the evidence is conflicting or susceptible to different reasonable inferences, the issue is for the jury to determine); *Macklin Enterprises, Inc.*, 303 S.C. at 387, 401 S.E. (2d) at 155 (issues of reliance and its reasonableness are preeminently factual issues for the trier of facts).

### IV. *Discovery Limitations*

ML–Lee argues the trial court erred by limiting ML–Lee's discovery to documents directly dealing with inventory. We disagree. A trial court's ruling on discovery issues will not be disturbed on appeal absent abuse of discretion. *Dunn v. Dunn*, 298 S.C. 499, 381 S.E. (2d) 734 (1989). Abuse of discretion will only be found where the appellant shows that the conclusion reached by the lower court was without reasonable factual support, resulting in prejudice to the appellant. *Id.* Deloitte disputes ML–Lee's allegation that the scope of discovery was limited to inventory documents, alleging Deloitte either voluntarily or pursuant to the trial court's orders, gave copies to ML–Lee of audit materials and correspondence files outside the inventory area. However, even if ML–Lee's allegations were true, we find no abuse by the trial court in limiting the scope of discovery. The discovery in this action consisted of more than 50 depositions and the production of more than 20,000 pages of documents. In determining the existence of Deloitte's duty to ML–Lee, the primary issue in this case, the audit documents produced were sufficient.

### V. *Summary*

To summarize, we conclude that the trial court properly adopted the approach set forth in the *Restatement (Second) of Torts* § 552 for determining the scope of a public accountant's duty to third parties who use and rely on his work. However, we find that the trial court misapplied the *Restatement* standard to the facts of this case. While we agree with the trial court that Deloitte owed ML–Lee no duty in connection with the 1985 and 1986 audit reports and financial statements, we

find that Deloitte did owe ML–Lee a duty in connection with the 1987 audit report and financial statements and the comfort letter. Because of the nature of the relationship between ML–Lee and Deloitte in December, 1990, we also conclude that Deloitte had a duty to disclose to ML–Lee its knowledge of the potential inventory overvaluation. Moreover, if the jury concludes that, because of Deloitte's knowledge in November-December 1990 of Emb-Tex's inventory problems, Deloitte knew or should have known that the information in the previously issued audit reports was inaccurate, then Deloitte also had a duty to withdraw those reports or reveal the inaccuracies to ML–Lee. We further conclude that reliance by Lee Advisor as agent for ML–Lee is sufficient to satisfy the *Restatement*'s reliance requirement, and that ML–Lee has presented evidence sufficient to avoid summary judgment on the question of reliance.

We emphasize that, because they were the only issues addressed by the trial court, this opinion discusses only the issues of duty and reliance. Before it can prevail on its claim, ML–Lee will be required to establish the remaining elements of its negligent misrepresentation claim, including that any reliance was justifiable, and that the reliance was the proximate cause of its damages. It should be remembered that this case came to us after a motion for summary judgment, and nothing in this opinion should be interpreted as expressing an opinion on the merits of ML–Lee's claim, or as comment on the likelihood of ML–Lee's success at trial.

Accordingly, for the foregoing reasons, the decision of the trial court is hereby

Affirmed in part, reversed in part, and remanded.